IN THE SUPREME COURT OF NORTH CAROLINA

No. 86PA24

Filed 21 March 2025

EMILY HAPPEL, individually, TANNER SMITH, a minor, and EMILY HAPPEL on behalf of TANNER SMITH as his mother

v.

GUILFORD COUNTY BOARD OF EDUCATION and OLD NORTH STATE MEDICAL SOCIETY, INC.

On discretionary appeal pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 292 N.C. App. 563, 899 S.E.2d 387 (2024), affirming an order entered on 1 March 2023 by Judge Lora C. Cubbage in Superior Court, Guilford County, granting defendants' motion to dismiss. Heard in the Supreme Court on 23 October 2024.

*Walker Kiger, PLLC, by David Steven Walker, for plaintiff-appellants.*

*Tharrington Smith, LLP, by Stephen G. Rawson, for defendant-appellee Guilford County Board of Education; and Beacon Legal, PLLC, by Gavin J. Reardon, for defendant-appellee Old North State Medical Society, Inc.*

*Justine G. Tanguay for Children's Health Defense, amicus curiae.*

*Law Office of B. Tyler Brooks, PLLC, by B. Tyler Brooks, for Rep. Neal Jackson, Rep. Brian Biggs, Rep. Mark Brody, Rep. Keith Kidwell, Rep. Donnie Loftis, Rep. Joseph Pike, Rep. Frank Sossamon, and Rep. Jeff Zimmer, amici curiae.*

*Deborah J. Dewart and Tami Fitzgerald for NC Values Institute, amicus curiae.*

NEWBY, Chief Justice.

This case concerns a fourteen-year-old boy's attempt to seek a legal remedy after his school's chosen medical provider injected him with a COVID-19 vaccine against his and his mother's wishes. Plaintiffs, the child and his mother, present claims for battery and violations of their state constitutional rights. Defendants, the school board and the medical society with which it partnered, argue that the federal Public Readiness and Emergency Preparedness (PREP) Act completely immunizes them from plaintiffs' suit because it preempts all of their state law claims. Thus, we are tasked with considering whether Congress intended the PREP Act to immunize state actors who forcibly vaccinate a child without his or his parent's consent, thereby committing a battery and infringing their fundamental rights under the state constitution.

The PREP Act's plain text leads us to conclude that its immunity only covers tort injuries. Because tort injuries are not constitutional violations, the PREP Act does not bar plaintiffs' constitutional claims.[1] We therefore affirm the decision below as to plaintiffs' battery claim, reverse as to their constitutional claims, and remand for further proceedings.

---

[1] Unless otherwise noted, the words "constitutional" and "unconstitutional" refer to the state constitution.

## I.    Background and Procedural History

During the COVID-19 pandemic, "we may have experienced the greatest intrusions on civil liberties in the peacetime history of this country." *Arizona v. Mayorkas*, 143 S. Ct. 1312, 1314 (2023) (statement of Gorsuch, J.). "Fear and the desire for safety are powerful forces. They can lead to a clamor for action—almost any action—as long as someone does something to address a perceived threat." *Id.* at 1315. Government officials across the Nation "imposed lockdown orders forcing people to remain in their homes. They shuttered businesses and schools, public and private. They closed churches even as they allowed casinos and other favored businesses to carry on." *Id.* at 1314. And in our State, medical workers affiliated with a public school forcibly vaccinated a fourteen-year-old boy despite knowing they lacked consent from both the child and his mother.

In August 2021, Western Guilford High School notified its football players and their parents, including fourteen-year-old Tanner Smith and his mother, Emily Happel, that it had identified a cluster of COVID-19 cases among the team.[2] It therefore suspended all team activities and required players to undergo COVID-19 testing or be "cleared by a public health professional" before returning to practice. The school provided a list of three locations at which players could receive free testing,

---

[2] This matter comes to this Court following the trial court's grants of motions to dismiss under Rules 12(b)(1) and 12(b)(6) of the North Carolina Rules of Civil Procedure. As such, we take all of plaintiffs' unproven allegations as true for purposes of our review. *See United Daughters of the Confederacy v. City of Winston-Salem ex rel. Joines*, 383 N.C. 612, 624, 881 S.E.2d 32, 43 (2022).

one of which was a dual testing and vaccination clinic hosted at the school itself and operated in partnership with defendant Old North State Medical Society (ONSMS). The letter sent to players and their parents, however, only stated that the school clinic offered COVID-19 *tests*. It did not explain that the school clinic also provided COVID-19 *vaccines*, nor did it state that the school clinic required students to bring a signed parental consent form before they could be vaccinated.

A few days later, Smith's stepfather drove him to the school clinic to be tested. Smith did not want to be vaccinated. He did not bring a signed consent form and was unaware that the school clinic even offered vaccines until arriving that day. Clinic workers nonetheless attempted to contact the child's mother over the phone to obtain consent to vaccinate her son. Happel did not answer, at which point one of the workers instructed another to "give it to [Smith] anyway." The workers made no effort to contact Smith's stepfather, who was waiting outside in the parking lot. Ignoring additional protests from Smith himself, the workers forcibly injected him with the first dose of the Pfizer/BioNTech vaccine.

Plaintiffs sued the local school board and ONSMS for battery and violations of their state and federal constitutional rights. Both defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the North Carolina Rules of Civil Procedure. In support of their motions, defendants cited the PREP Act, a federal law passed in 2005 "to encourage the expeditious development and deployment of medical countermeasures during a public health emergency." *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th

845, 849 (6th Cir. 2023) (internal alterations omitted) (quoting *Cannon v. Watermark Ret. Cmtys., Inc.*, 45 F.4th 137, 139 (D.C. Cir. 2022)).[3] The PREP Act confers broad protections on certain "covered person[s]" during public health emergencies, rendering them "immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(1). To effectuate this purpose, the Act expressly overrides, or "preempts," any conflicting state laws. *Id.* § 247-6d(b)(8).

The United States Secretary of Health and Human Services (HHS) triggers and "controls the scope" of the Act's protections by issuing an emergency declaration. *Saldana*, 27 F.4th at 687. On 10 March 2020, HHS Secretary Alex Azar issued a declaration identifying the COVID-19 outbreak as a public health emergency and activating the Act's immunity provision. *Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19*, 85

---

[3] *Hudak* is one of several federal cases considering whether the PREP Act "completely preempts" state law. 58 F.4th at 857; *see also, e.g.*, *Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 687 (9th Cir. 2022); *Solomon v. St. Joseph Hosp.*, 62 F.4th 54, 60 (2d Cir. 2023). While these cases provide helpful background about the PREP Act, they do not address the immunity issue before this Court. They instead discuss a federal jurisdictional doctrine misleadingly called "complete preemption." As such, they do not apply to this case. *See Politella v. Windham Se. Sch. Dist.*, 325 A.3d 88, 97 (Vt. 2024) ("[The plaintiffs] point to various federal decisions concluding that the PREP Act does not preempt state-law claims. These cases are inapposite because they address the question of whether the PREP Act creates federal-question subject-matter jurisdiction over certain health-care-related claims."); *see also Hudak*, 58 F.4th at 852 (distinguishing between complete and "ordinary" preemption).

Fed. Reg. 15198, 15198–15203 (Mar. 17, 2020) [hereinafter *Secretary's Declaration*]. Relevant here, the declaration identified "[a]ny vaccine[ ] used to treat, diagnose, cure, prevent, or mitigate COVID-19" as a covered countermeasure. *Id.* at 15202.

The trial court agreed with defendants' arguments about the PREP Act and dismissed the suit. Plaintiffs appealed to the Court of Appeals. There plaintiffs abandoned their federal constitutional arguments but contended that the PREP Act did not cover battery and violations of their rights under Article I, Sections 1, 13, and 19 of the state constitution—specifically, Happel's right to control her child's upbringing and both plaintiffs' right to Smith's bodily autonomy. The lower court unanimously affirmed, holding that the PREP Act's "extremely broad" immunity shielded defendants from liability on all of plaintiffs' claims. *Happel v. Guilford Cnty. Bd. of Educ.*, 292 N.C. App. 563, 569, 899 S.E.2d 387, 392 (2024).

In support of its decision, the Court of Appeals primarily relied on three cases from other jurisdictions applying PREP Act immunity to similar factual scenarios. *Id.* at 570, 899 S.E.2d at 393. First, the court looked at *Parker v. St. Lawrence County Public Health Department*, 954 N.Y.S.2d 259, 260–61 (N.Y. App. Div. 2012), a pre-COVID case about a nurse who negligently administered the H1N1 influenza vaccine to a minor without parental consent. *Happel*, 292 N.C. App. at 570, 899 S.E.2d at 393. In *Parker*, a New York state appellate court held that the PREP Act prevented the child's parents from bringing state law claims for negligence and battery. 954 N.Y.S.2d at 260–61.

Next, the Court of Appeals cited *Cowen v. Walgreen Co.*, an unreported federal case from the Northern District of Oklahoma. *Happel*, 292 N.C. at 570, 899 S.E.2d at 393. The plaintiff in *Cowen* went to a Walgreens pharmacy intending to receive an influenza vaccine; instead, the employee accidentally gave her a COVID-19 vaccine. No. 22-CV-157, slip op. at 2–3 (N.D. Okla. Dec. 13, 2022) (unreported), *appeal dismissed*, No. 23-5003, 2023 WL 4419805 (10th Cir. June 5, 2023). Although the plaintiff sued Walgreens for negligence and vicarious liability, the court held that the PREP Act preempted her claims. *Id.* at 6. It therefore granted the company's motion to dismiss. *Id.*

Finally, the Court of Appeals examined *M.T. ex rel. M.K. v. Walmart Stores, Inc.*, 528 P.3d 1067, 1070 (Kan. Ct. App. 2023), a decision from Kansas's intermediate appellate court. *Happel*, 292 N.C. App. at 570–71, 899 S.E.2d at 393. The plaintiff in *M.T.* sued Walmart and one of its pharmacists for administering a COVID-19 vaccine to her fifteen-year-old daughter without parental consent. *M.T.*, 528 P.3d at 1071. The teenager herself had told the pharmacist that she wanted to be vaccinated, and the pharmacist mistakenly advised her that Kansas law did not require parental consent for fifteen-year-olds. *Id. See generally* Kan. Stat. Ann. § 38-123(b) (2021) (requiring parental consent for minors under the age of *sixteen*). When the mother found out, she brought state law claims including battery, negligence, violation of parental rights, and invasion of privacy. *M.T.*, 528 P.3d at 1071. She did not, however, bring constitutional claims. *Id.* at 1084. Like *Parker* and *Cohen*, *M.T.* held that the

PREP Act fully immunized the defendants from suit. *Id.*

The Court of Appeals concluded that these three cases provided "instructive [and] persuasive" support for dismissing plaintiffs' case. *Happel*, 292 N.C. App. at 571, 899 S.E.2d at 393. The court explained that the PREP Act's broad scope "constrained" and "[b]ound" its decision. *Id.* at 571, 899 S.E.2d at 394. "Wisely or not, the plain language of the PREP Act includes claims of battery and violations of state constitutional rights within the scope of its immunity, and it therefore shields [d]efendants from liability for [p]laintiffs' claims." *Id.* at 569, 899 S.E.2d at 392. In closing, the Court of Appeals acknowledged, "We are not to question the wisdom or policy of the statute under consideration, but should enforce it as it is written, unless we conclude that there is an unmistakable conflict with the organic law." *Id.* at 571, 899 S.E.2d at 394 (quoting *Faison v. Bd. of Comm'rs*, 171 N.C. 411, 415, 88 S.E. 761, 763 (1916)).

Plaintiffs filed a petition for discretionary review with this Court, proposing five issues for our consideration. *See generally* N.C.G.S. § 7A-31 (2023). We allowed the petition as to the first issue only: whether the lower courts erred by concluding that the PREP Act preempted plaintiffs' claims in their entirety.

## II.    Analysis

We conduct our review de novo, "view[ing] the allegations as true and the supporting record in the light most favorable to the non-moving party." *United Daughters*, 383 N.C. at 624, 881 S.E.2d at 43 (quoting *Mangum v. Raleigh Bd. of*

*Adjustment*, 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008)). This standard of review applies "regardless of whether the complaint is dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) or for failure to state a claim upon which relief could be granted pursuant to Rule 12(b)(6)." *Id.*

For purposes of this opinion, we assume without deciding that plaintiffs present valid "*Corum* claims" for violations of their constitutional rights. *See generally Corum v. Univ. of N.C.*, 330 N.C. 761, 413 S.E.2d 276 (1992). "*Corum* offers a common law cause of action when existing relief does not sufficiently redress a violation of a particular constitutional right." *Kinsley v. Ace Speedway Racing, Ltd.*, 904 S.E.2d 720, 725 (N.C. 2024) (quoting *Askew v. City of Kinston*, 902 S.E.2d 722, 728 (N.C. 2024)). *Corum* claims have three elements:

> First, the complaint must allege that a state actor violated the claimant's state constitutional rights. Second, "the claim must be colorable," meaning that the claim "must present facts sufficient to support an alleged violation of a right protected by the [s]tate [c]onstitution." Third, there must be no other "adequate state remedy" for this alleged constitutional violation.

*Id.* at 726 (citations omitted) (quoting *Deminski ex rel. C.E.D. v. State Bd. of Educ.*, 377 N.C. 406, 413, 858 S.E.2d 788, 793–94 (2021)).

## A. Fundamental Rights Under the State Constitution

Plaintiffs assert that this case implicates a pair of fundamental rights implicitly protected by the state constitution's Law of the Land Clause: Happel's parental right to control the upbringing of her son and plaintiffs' shared right to

Smith's bodily autonomy.[4] The Law of the Land Clause, found at Article I, Section 19, provides, "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. "The Law of the Land Clause guarantees the famous trinity of life, liberty, and property. It traces its antecedents back to the Magna Carta, and it has existed in similar form in all three iterations of our constitution." *McKinney v. Goins*, 911 S.E.2d 1, 11 (N.C. 2025) (citations and quotations omitted).

We consider the Law of the Land Clause our State's analogue to the Due Process Clause of the Fourteenth Amendment. *Halikierra Cmty. Servs. LLC v. N.C. Dep't of Health & Hum. Servs.*, 385 N.C. 660, 663, 898 S.E.2d 685, 688–89 (2024). Like the Due Process Clause, which encompasses a limited category of non-enumerated "substantive due process" rights, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022), the "libert[ies]" protected under our Law of the Land Clause include a few fundamental rights not mentioned elsewhere in the constitution, *see N.C. Dep't of Transp. v. M.M. Fowler, Inc.*, 361 N.C. 1, 4–5, 637 S.E.2d 885, 889 (2006).

Both this Court and the Supreme Court of the United States "tread carefully

---

[4] A parent generally shares in her child's rights. *Cf. Parham v. J.R.*, 442 U.S. 584, 600, 99 S. Ct. 2493, 2503 (1979) ("Normally, however, since [the child's] interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child, the private interest at stake is a combination of the child's and parents' concerns.").

before recognizing a fundamental liberty interest" implicit in the due process clauses of our respective constitutions. *See Standley v. Town of Woodfin*, 362 N.C. 328, 332, 661 S.E.2d 728, 730 (2008); *accord Dobbs*, 142 S. Ct. at 2247. We do so in recognition that the legislature, not the judiciary, is the appropriate branch for making policy. When courts venture beyond the constitutional text in search of implied rights, they risk "usurp[ing] authority . . . entrust[ed] to the people's elected representatives." *Dobbs*, 142 S. Ct. at 2247. In other words, "[w]e are designed to be a government of the people, not of the judges." *Harper v. Hall*, 384 N.C. 292, 299, 886 S.E.2d 393, 399 (2023).

Accordingly, the relevant test asks whether the asserted right is "objectively, deeply rooted in this Nation's [or State's] history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." *Standley*, 362 N.C. at 331, 661 S.E.2d at 730 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S. Ct. 2258, 2268 (1997)); *cf. Johnston v. Rankin*, 70 N.C. 550, 555 (1874) (concluding that the Law of the Land Clause implicitly protects the right to just compensation for takings of private property because "the principle is so grounded in natural equity[ ] that it has never been denied to be a part of the law of North Carolina"). By conducting this stringent inquiry, we "guard against the natural human tendency to confuse [the constitutional meaning of 'liberty'] with our own ardent views about the liberty that [the people] should enjoy." *Dobbs*, 142 S. Ct. at 2247.

Perhaps unsurprisingly, the Supreme Court of the United States recognizes "[p]recious few rights" as "fundamental in nature." *Standley*, 362 N.C. at 332, 661 S.E.2d at 730. The Due Process Clause's implicit protections "have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272, 114 S. Ct. 807, 812 (1994). *But see Dobbs*, 142 S. Ct. at 2242 (recognizing that "any such right must be deeply rooted in . . . history and tradition and implicit in the concept of ordered liberty" (citations and quotations omitted)). The right of a parent to make medical decisions on her child's behalf fits comfortably within this narrow framework, as does the right to refuse forced, nonmandatory medical treatment.[5] Indeed, the Supreme Court has consistently recognized and affirmed their existence under the Due Process Clause for decades. We therefore consider those decisions instructive in construing the scope of the rights plaintiffs claim under our Law of the Land Clause. *See Bacon v. Lee*, 353 N.C. 696, 721, 549 S.E.2d 840, 856–57 (2001) (explaining that federal opinions about the Due Process Clause offer persuasive value for this Court's interpretation of the Law of the Land Clause). We address plaintiffs' asserted interests in turn.

### 1. *Parental Right to Control*

First, we agree that the state constitution protects a parent's right to control her child's upbringing, including her right to make medical decisions on her child's

---

[5] By "nonmandatory," we mean not otherwise lawfully required.

behalf. At this point, there can be little doubt that our State and Nation have each fiercely guarded parental rights and consider them integral to the preservation of liberty and justice. The Supreme Court of the United States has unequivocally recognized that parents possess a fundamental right to dictate their children's upbringing. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060 (2000) (collecting cases). Given our State's own longstanding protection of parental rights, *see, e.g.*, *Atkinson v. Downing*, 175 N.C. 244, 246, 95 S.E. 487, 488 (1918), we see no reason to interpret our Law of the Land Clause differently here.

"It is through the family that we inculcate and pass down many of our most cherished values, [both] moral and cultural." *Moore v. City of E. Cleveland*, 431 U.S. 494, 503–04, 97 S. Ct. 1932, 1938 (1977). Parents, as the traditional heads of the family unit, spearhead that process. *See In re Watson*, 157 N.C. 340, 354, 72 S.E. 1049, 1054 (1911) ("It is to be remembered that the public has a paramount interest in the virtue and knowledge of its members . . . . That parents are ordinarily [e]ntrusted with [their children's education] is because it can seldom be put into better hands . . . ." (quoting *Ex parte Crouse*, 4 Whart. 11, 11 (Pa. 1839))). The right to control the upbringing of one's own child is deeply rooted in "[t]he history and culture of Western civilization" and is "now established beyond debate as an enduring American tradition." *Troxel*, 530 U.S. at 66, 120 S. Ct. at 2060 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 1541–42 (1972)). The Supreme Court therefore reads the Due Process Clause to protect "broad parental authority over

minor children," *id.* (quoting *Parham*, 442 U.S. at 602, 99 S. Ct. at 2504), and "reject[s] any notion that a child is 'the mere creature of the State,' " *Parham*, 442 U.S. at 602, 99 S. Ct. at 2504 (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535, 45 S. Ct. 571, 573 (1925)). The Court has gone so far as to describe "the interest of parents in the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests" it has recognized. *Troxel*, 530 U.S. at 65, 120 S. Ct. at 2060 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S. Ct. 625, 626–27 (1923)). "In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66, 120 S. Ct. at 2060.

This Court affirmed "the paramount right of parents to custody, care, and nurture of their children" even earlier than the Supreme Court of the United States. *Petersen v. Rogers*, 337 N.C. 397, 402, 445 S.E.2d 901, 904 (1994). As far back as the early twentieth century, this Court explained that North Carolina law "fully recognized" the natural and substantive rights of parents to "the custody and control of their infant children." *Atkinson*, 175 N.C. at 246, 95 S.E. at 488. These rights "grow[ ] out of the parent's duty to provide for their helpless offspring" and are "grounded in the strongest and most enduring affections of the human heart." *In re Jones*, 153 N.C. 312, 315, 69 S.E. 217, 218 (1910).

Although parental rights are not absolute, government interference is not

justified "except when the good of the child clearly requires it." *Atkinson*, 175 N.C. at 246, 95 S.E. at 488. "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602, 99 S. Ct. at 2504. Parents presumably act in the best interests of their children, and parents, not the State, presumably know what those best interests are.

Defendants argue that since our parental rights caselaw only covers literal custody and control, it does not apply to the sort of parental right asserted in this case—the right to consent on the child's behalf. Contrary to defendants' arguments, our precedents expressly contemplate that parental rights extend further. This Court's decision in *Spitzer v. Lewark*, for example, answered a narrow question: whether competent evidence supported awarding custody to a mother with a history of serious mental illness. 259 N.C. 50, 52, 129 S.E.2d 620, 621 (1963). But in upholding the custody decision, this Court also explained, "As a general rule at common law, and in this State, parents have the natural and legal right to the custody, companionship, *control, and bringing up* of their infant children, and the same being a natural and substantive right may not lightly be denied or interfered with by action of the courts." *Id.* at 53–54, 129 S.E.2d at 623 (emphasis added); *cf. Adams v. Tessener*, 354 N.C. 57, 60, 550 S.E.2d 499, 501 (2001) ("[A] parent enjoys a fundamental right 'to make decisions concerning the care, custody, and control' of his or her children under the Due Process Clause of the Fourteenth Amendment to

the United States Constitution." (quoting *Troxel*, 530 U.S. at 66, 120 S. Ct. at 2060)).

Indeed, the constitutional right to full "custody and control" over one's minor children would ring hollow if it did not include the right to consent on the child's behalf, as well as the right to seek a constitutional remedy when the State disregards the absence of that consent. *Cf. In re Stumbo*, 357 N.C. 279, 287, 582 S.E.2d 255, 260 (2003) ("[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." (alteration in original) (quoting *Troxel*, 530 U.S. at 68–69, 120 S. Ct. at 2061)). Our state constitution and caselaw have long implied the existence of the precise right plaintiffs claim here. We directly recognize it today.

### 2. *Right to Bodily Integrity*

Next, we examine whether the Law of the Land Clause confers a right to bodily autonomy. Although we do not construe this right as broadly as plaintiffs argue, we agree that the Law of the Land Clause protects the right to bodily *integrity*, which we define as the right of a competent person to refuse forced, nonmandatory medical treatment.[6] *See Glucksberg*, 521 U.S. at 725, 117 S. Ct. at 2270 ("The right [to refuse

---

[6] When litigants assert the right to bodily integrity under the Federal Constitution, they sometimes make First Amendment religious freedom arguments. *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 270, 110 S. Ct. 2841, 2847 (1990). Similarly, plaintiffs' complaint here also cites Article I, Section 13 of the state constitution, which guarantees that

medical treatment is] *not simply deduced from abstract concepts of personal autonomy*." (emphasis added)). Our conclusion aligns with the Supreme Court's understanding of the bodily integrity right under the Due Process Clause, which traces its roots to common-law battery. *See Cruzan*, 497 U.S. at 278, 110 S. Ct. at 2851 (stating that previous Supreme Court cases implied a right to refuse medical treatment); *Vacco v. Quill*, 521 U.S. 793, 807, 117 S. Ct. 2293, 2301 (1997) (explaining that the reasoning of *Cruzan*, which assumed the existence of a federal constitutional right to refuse medical treatment, was grounded in "well-established, traditional rights to bodily integrity and freedom from unwanted touching"); *see also, e.g.*, *Rochin v. California*, 342 U.S. 165, 174, 72 S. Ct. 205, 210 (1952).

"At common law, even the touching of one person by another without consent and without legal justification was a battery." *Cruzan*, 497 U.S. at 269, 110 S. Ct. at 2846 (citing W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* 39–42 (5th ed. 1984)). From that high standard developed the American tort law rule that medical treatment generally requires the patient's informed consent, which itself led to judicial recognition of the fundamental right to bodily integrity under the Federal Constitution. *Id*. This constitutional right includes a competent person's ability to refuse "[t]he forcible injection of medication" into his own body, *Washington v.*

---

"no human authority shall, in any case whatsoever, control or interfere with the rights of conscience." N.C. Const. art. I, § 13. Because we hold that the Law of the Land Clause independently protects the interest plaintiffs assert in this case, we do not address its relationship with Article I, Section 13.

*Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041 (1990), a natural conclusion given the common-law tort backdrop from which the right emerged.

Although the constitutional right to bodily integrity originated in common-law battery, the two are not equivalent. The constitutional right "is infringed by a serious, as distinct from a nominal or trivial, battery. The qualification is important. Because any offensive touching (unless consented to, which removes the offense) is a battery, most batteries are too trivial to amount to deprivations of liberty." *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003) (citations omitted). Fundamental constitutional liberties are "not a 'font of tort law,' " *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848, 118 S. Ct. 1708, 1718 (1998) (quoting *Paul v. Davis*, 424 U.S. 693, 701, 96 S. Ct. 1155, 1160–1161 (1976)), and the Supreme Court has "rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct" to support a violation of constitutional rights, *id.* at 848–49, 118 S. Ct. at 1718; *see also Rubek v. Barnhart*, 814 F.2d 1283, 1285 (8th Cir. 1987) (explaining that it is "well established that not every violation of state tort or criminal assault laws . . . results in a constitutional violation"). Nonconsensual medical treatment, however, satisfies these criteria: "The right to be free of state-sponsored invasion of a person's bodily integrity is protected by the [constitutional] guarantee of due process." *Guertin v. Michigan*, 912 F.3d 907, 921 (6th Cir. 2019) (quoting *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 810–11 (S.D. Ohio 1995)).

Nonetheless, the bodily integrity right is not absolute. Courts across the

United States have overwhelmingly held that the fundamental right to refuse medical treatment does not imply a fundamental right to disregard a vaccine mandate. *See, e.g., Children's Health Def., Inc. v. Rutgers, the State Univ. of N.J.*, 93 F.4th 66, 78 n.25 (3d Cir. 2024) (collecting cases), *cert. denied*, 144 S. Ct. 2688 (2024). Litigants in these cases frequently attempt to invoke the broad right "to refuse medical treatment" articulated in *Cruzan*, a case that considered the right to terminate life support. *Id.* at 79 (quoting *Cruzan*, 497 U.S. at 277, 110 S. Ct. at 2851). But courts instead continue to look to the Supreme Court's much older decision in *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S. Ct. 358 (1905), which sustained a criminal conviction for refusing a smallpox vaccine. *Children's Health Def.*, 93 F.4th at 78. These courts reiterate *Jacobson*'s acknowledgement that " '[t]here are manifold restraints to which every person is necessarily subject for the common good,' including a community's 'right to protect itself against an epidemic of disease which threatens the safety of its members.' " *Id.* at 78–79 (alteration in original) (citations omitted) (quoting *Jacobson*, 197 U.S. at 26–27, 25 S. Ct. at 361).

Like the Supreme Court itself, courts confronting this issue distinguish *Cruzan* from *Jacobson* by reasoning that public welfare may sometimes justify vaccination mandates; purely individualized medical decisions, on the other hand, do not implicate such concerns. *See id.* at 79–80 ("*Cruzan* . . . explained *Jacobson* as a case where 'an individual's liberty interest in declining an unwanted smallpox vaccine' was outweighed by 'the State's interest in preventing disease.' " (quoting *Cruzan*, 497

U.S. at 278, 110 S. Ct. at 2851)). This Court issued a pair of analogous decisions at the start of the twentieth century. First, in *State v. Hay*, it held that local governments could enact ordinances requiring vaccination and impose criminal punishment for noncompliance. 126 N.C. 999, 1001, 35 S.E. 459, 460 (1900). Four years later, in *Hutchins v. School Committee*, it reasoned that schools could condition student admission on vaccination status. 137 N.C. 68, 71, 49 S.E. 46, 47 (1904).

Those cases, however, do not apply to the particular constitutional claims before us today. Plaintiffs do not argue that they have a categorical right to disobey a vaccine mandate. Rather, their argument is essentially about the existence of a right to resist an unwanted, nonmandatory medical touching that in this instance just so happened to be a vaccine. Indeed, they write in their opening brief: "[Plaintiffs' battery and state constitutional] claims would result regardless of what substance had been administered to [Smith]. It matters not whether it was a COVID-19 vaccine, a chickenpox vaccine, an [a]spirin, or open-heart surgery."

Tellingly, defendants do not attempt to justify the workers' behavior, nor do they claim Smith's vaccination was necessary to protect the health of his football teammates, the school population, or the general public. Instead, defendants simply contend that they are not *liable* for this action, whether because of PREP Act immunity, the principal-agent relationship, or another legal theory. Both sides acknowledge that defendants only required Smith to undergo testing or be otherwise cleared by a medical professional, a requirement with which he dutifully complied.

The parties also recognize that defendants' policy required parental consent as a condition of vaccination and that parental consent was not given here.

Despite the ultimate holdings of *Jacobson*, *Hay*, and *Hutchins*, each stressed the importance of individual liberty and justified its restraints by emphasizing that the liberty of one person was no more valuable than the liberty of others. *See Jacobson*, 197 U.S. at 26, 25 S. Ct. at 361 ("Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, . . . regardless of the injury that may be done to others."); *Hay*, 126 N.C. at 1000, 35 S.E. at 460 ("All government is a necessary evil. It is, however, a much lesser evil than the intolerable state of things which would exist if there were no government to bridle the absolute right of every man to do that which seems right in his own eyes . . . ."); *Hutchins*, 137 N.C. at 71–72, 49 S.E. at 47 ("That [the plaintiff's daughter] cannot safely be vaccinated may make it preferable that she herself should run the risk of taking the smallpox, but is no reason that the children of the public school should be exposed to like risk . . . ."). Those public good rationales are glaringly absent from this case.

Plaintiffs assert a straightforward right to refuse forced, nonmandated medical treatment, a right that springs from the common-law right to refuse unwanted touching, *see Cruzan*, 497 U.S. at 269, 110 S. Ct. at 2846, and falls squarely within

the boundaries of our constitution's Law of the Land Clause.[7] Accordingly, we do not

apply *Jacobson*, *Hay*, and *Hutchins*. *Cf. Calvary Chapel Dayton Valley v. Sisolak*, 140

S. Ct. 2603, 2608 (2020) (Kavanaugh, J., dissenting) ("[I]t is a mistake to take

language in *Jacobson* as the last word on what the Constitution allows public officials

to do during the COVID-19 pandemic. Language in *Jacobson* must be read in

context . . . ."). We conclude that the Law of the Land Clause protects both a parent's

right to control her child's upbringing and the right to bodily integrity, defined as the

right of a competent person to refuse forced and nonmandatory medical treatment.

---

[7] Furthermore, both this Court and the Supreme Court of the United States have recognized that the government's use of a needle to make "a compelled physical intrusion beneath [a person's] skin and into his veins" is an inherently invasive act warranting constitutional protection in the context of searches and seizures. *Missouri v. McNeely*, 569 U.S. 141, 148, 133 S. Ct. 1552, 1558 (2013); *see, e.g.*, *State v. Burris*, 289 N.C. App. 535, 538, 890 S.E.2d 539, 542 (2023), *aff'd*, 386 N.C. 600, 906 S.E.2d 465 (2024) (per curiam). The Supreme Court considers this intrusion so severe that police officers collecting evidence from suspected drunk drivers must ordinarily obtain a warrant before drawing blood, even though a warrant is not needed to compel the "significantly less intrusive" alternative of a breath test. *Birchfield v. North Dakota*, 579 U.S. 438, 475–76, 136 S. Ct. 2160, 2185 (2016); *see also Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2543–44 (2019) (Sotomayor, J., dissenting) (exploring the rationales behind the Supreme Court's precedent on this subject).

Of course, the constitutional protection against compelled blood draws is not equivalent to the constitutional right to refuse medical treatment. But the Supreme Court frames both around the concept of bodily integrity. *Compare McNeely*, 569 U.S. at 148, 133 S. Ct. at 1558 ("Such an invasion of bodily integrity implicates an individual's most personal and deep-rooted expectations of privacy." (internal quotation omitted)), *with Cruzan*, 497 U.S. at 269, 110 S. Ct. at 2846 ("This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment."). Moreover, when the Supreme Court first recognized the right to refuse forced intravenous medication, it cited an early case about warrantless blood draws. *See Harper*, 494 U.S. at 229, 110 S. Ct. at 1041 (citing *Schmerber v. California*, 384 U.S. 757, 772, 86 S. Ct. 1826, 1836–37 (1966)).

## B. Federal Preemption of State Law

Nonetheless, if defendants are correct that Congress fully barred plaintiffs' claims, the state constitution would have no practical effect on this case's outcome. *See* U.S. Const. art. VI, cl. 2; N.C. Const. art. I, § 5; *see also DTH Media Corp. v. Folt*, 374 N.C. 292, 306, 841 S.E.2d 251, 261 (2020) ("Generally, if a state law conflicts with a federal law that regulates the same conduct, the federal law prevails under the doctrine of preemption."). We must therefore determine to what extent Congress preempted state law when it passed the PREP Act. To do so, we consider North Carolina's place in this Nation's federalist system of government.

### 1. Overview of Federal Preemption and Related Principles

"Federalism was our Nation's own discovery. The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838, 115 S. Ct. 1842, 1872 (1995) (Kennedy, J., concurring). "It is appropriate to recall these origins, which instruct us as to the nature of the two different governments created and confirmed by the [Federal] Constitution." *Id.* at 838–39, 115 S. Ct. at 1872.

In 1789, the American people memorialized this power-sharing relationship upon ratifying the Federal Constitution. The year before ratification, James Madison explained how the structure would work:

> The powers delegated by the proposed Constitution to the
> federal government are few and defined. Those which are

> to remain in the State governments are numerous and indefinite. . . . The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.

*The Federalist* No. 45, at 289 (James Madison) (Clinton Rossiter ed., 1961); *cf.* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Thus, under the Federal Constitution, our State often exercises legal authority beyond the purview of the federal government. This Court, for instance, is the ultimate interpreter of our state constitution. *State v. Tirado*, 911 S.E.2d 51, 59 (N.C. 2025).

But North Carolina does not have free rein to ignore the federal government altogether. The Framers clearly intended federal law to trump conflicting state law, even state constitutional law. The Supremacy Clause of Article VI to the Federal Constitution provides, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; *see also* N.C. Const. art. I, § 5 ("Every citizen of this State owes paramount allegiance to the Constitution and government of the United States, and no law or ordinance of the State in contravention or subversion thereof can have any binding force."). Under the Supremacy Clause, Congress may enact laws explicitly or implicitly preempting state law. *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894,

1901 (2019).

Given the strong language the Framers used to emphasize both the sovereignty of the States and the supremacy of federal law, the Supreme Court of the United States has grappled with the boundaries of preemption for centuries. *See, e.g.*, *M'Colloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819); *Va. Uranium*, 139 S. Ct. at 1900. The Supreme Court's modern precedent considers congressional purpose "the ultimate touchstone" in every preemption analysis. *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250 (1996)). Importantly, these cases establish a "starting presumption that Congress does not intend to supplant state law," *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S. Ct. 1671, 1676 (1995), and assume "that the historic police powers of the States are not to be superseded by [a federal statute] unless that was the clear and manifest purpose of Congress," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 543 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947)). "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Id.*[8]

---

[8] The dissent proclaims that the Supreme Court's "more recent precedents clarify that such presumptions do not apply where the act contains an express preemption clause" and that prior decisions applying that presumption, like *Altria*, are "outdated." To the contrary, the scope of the lone Supreme Court case the dissent cites, *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 125, 136 S. Ct. 1938, 1946 (2016), is an open question. *See, e.g.*, *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1108 (9th Cir. 2024) (O'Scannlain,

In cases of express preemption, like the PREP Act, the inquiry must begin by "focus[ing] on the plain wording of the clause, which necessarily contains the best evidence of Congress'[s] pre-emptive intent." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62–63, 123 S. Ct. 518, 526 (2002) (quoting *CSX Transp., Inc. v. Easterwood*, 507

---

J., concurring) ("[T]he law [after *Franklin*] remains troubling and confused—beset by tensions in Supreme Court precedents, disagreement among the circuits, and important practical questions still unanswered."). *Franklin* did not overrule prior cases applying the presumption to express preemption cases. *Id.* at 1110. Nor has the Supreme Court cited *Franklin* for that principle in the nearly nine years since its issuance.

Even the circuits that have read *Franklin* as dispensing altogether with the presumption in express preemption cases have acknowledged this uncertainty. *See, e.g.*, *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018) ("The Supreme Court has made somewhat varying pronouncements on presumptions in express preemption cases. . . . We think the best course is simply to follow as faithfully as we can the wording of the express preemption provision, without applying a presumption one way or the other."); *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (collecting cases and recognizing the circuit split).

When it comes to this case, we find the logic of the Third Circuit compelling:

> We disagree with [the defendant]'s assertion that "any presumption against express preemption no longer exists." [The defendant] relies on [*Franklin*,] a Supreme Court case that addressed whether the federal Bankruptcy Code's express preemption provision preempts a Puerto Rico statute, but that case did not address preemption of claims invoking historic state regulation of matters of health and safety, such as the products liability claims at issue here. As that case does not directly control here, we leave to the Supreme Court the prerogative of overruling its own decisions and continue to apply the presumption against preemption to claims, like those in this case, that invoke the historic police powers of the States.

*Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (citations, quotations, and alterations omitted); *see also Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131, 131 n.5 (3d Cir. 2018); *cf. King v. Town of Chapel Hill*, 367 N.C. 400, 406, 758 S.E.2d 364, 369 (2014) (recognizing the State's historic police power "to protect or promote the health, morals, order, safety, and general welfare of society" (quoting *Standley*, 362 N.C. at 333, 661 S.E.2d at 731)).

U.S. 658, 664, 113 S. Ct. 1732, 1737 (1993)). "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria*, 555 U.S. at 77, 129 S. Ct. at 543 (internal citations omitted). "[T]here is no factual basis for [assuming] . . . that every policy seemingly consistent with federal statutory text has necessarily been authorized by Congress and warrants pre-emptive effect." *Wyeth*, 555 U.S. at 602, 129 S. Ct. at 1216 (Thomas, J., concurring in judgment). "Instead, our federal system in general, and the Supremacy Clause in particular, accords pre-emptive effect to only those policies that are actually authorized by and effectuated through the statutory text." *Id.*

### 2. *Application to the PREP Act*

With these interpretative principles in mind, we consider whether the PREP Act preempts claims brought under our state constitution. As explained at the outset of our opinion, Congress passed the PREP Act to expedite the development, distribution, and administration of responsive measures to ongoing public health emergencies as defined by the contours of the HHS Secretary's emergency declaration. *See Hudak*, 58 F.4th at 849; 42 U.S.C. § 247d-6d(b)(1) ("[T]he Secretary may make a declaration . . . stating that [the immunity] is in effect *with respect to the activities so recommended*." (emphasis added)); *Saldana*, 27 F.4th at 687 (explaining

that the Secretary "controls the scope" of the PREP Act's immunity).[9]

The PREP Act's immunity provision reads:

> Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure . . . .

42 U.S.C. § 247d-6d(a)(1). Thus, there are essentially four elements to the PREP Act's

immunity: (1) a covered person, (2) a claim for loss, (3) the administration or use of a

covered countermeasure, and (4) a causal relationship between the administration or

---

[9] The emergency declaration here strongly implies—if not outright requires—that immunity only apply to situations in which the covered persons attempted to comply with the law:

> I[, HHS Secretary Azar,] have determined that liability immunity is afforded to Covered Persons *only for Recommended Activities involving Covered Countermeasures that are related to*:
>
> (a) Present or future federal contracts, cooperative agreements, grants, other transactions, interagency agreements, memoranda of understanding, or other federal agreements; or
>
> (b) *Activities authorized in accordance with the public health and medical response of the Authority Having Jurisdiction* to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures following a Declaration of an emergency.
>
> As used in this Declaration . . . [t]he Authority Having Jurisdiction means the public agency or its delegate that has legal responsibility and authority for responding to an incident, based on political or geographical (e.g., city, county, tribal, state, or federal boundary lines) or functional (e.g., law enforcement, public health) range or sphere of authority.

*Secretary's Declaration* at 15202 (emphases added); *see also id.* at 15201 (defining "Recommended Activities" as "the manufacture, testing, development, distribution, administration, and use of the Covered Countermeasure").

use of the covered countermeasure and the claim for loss. *See* Kevin J. Hickey, Cong. Rsch. Serv., LSB10443, *The PREP Act and COVID-19, Part 1: Statutory Authority to Limit Liability for Medical Countermeasures* 2–3 [hereinafter *The PREP Act and COVID-19*]. Plaintiffs dispute at least two of these elements here. First, is the administration or use of covered countermeasures in a manner that violates fundamental constitutional rights subject to the PREP Act's protections? And second, are plaintiffs' claims properly considered claims "for loss"?

### a. Immunization of Unconstitutional Conduct

As an initial matter, the ambiguity of the PREP Act's language requires us to consider whether Congress intended to include even unconstitutional conduct within the immunity's broad scope. Defendants ask us to adopt this literal reading. Plaintiffs, on the other hand, contend that Congress could not have intended to immunize—indeed, even *incentivize*—unconstitutional conduct.

We agree with plaintiffs. The literalist interpretation defendants urge us to adopt today defies even the broad scope of the statutory text. Under this view, Congress gave carte blanche to *any* willful misconduct related to the administration of a covered countermeasure, including the State's deliberate violation of fundamental constitutional rights, so long as it fell short of causing "death or serious physical injury." *See* 42 U.S.C. § 247d 6d(d)(1) ("[T]he sole exception to the immunity . . . shall be for an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful

-29-

misconduct."). The ramifications of this approach are deeply repugnant to our constitutional traditions and the history of this State and Nation. Defendants' interpretation would permit a state actor to vaccinate an unconscious patient, or a public school nurse to deliberately exaggerate the efficacy of a medical treatment to secure a parent's "consent." According to this literalist reading, both scenarios would be covered because neither led to death or serious physical injury. The fundamental and paramount constitutional rights to bodily integrity and parental control would be discarded without second thought. That simply cannot be what Congress intended. Nor could it have been the goal of the HHS Secretary, whose emergency declaration repeatedly predicated immunity on lawful, voluntary conduct. *See Secretary's Declaration* at 15202 ("I have also determined that, for governmental program planners only, liability immunity is afforded only to the extent such program planners obtain Covered Countermeasures through voluntary means . . . ."); *see also id.* (conditioning liability immunity for program planners and qualified persons on their "reasonabl[e] belie[f]" that the recipient was in the geographic area covered by the declaration).

It is similarly unconvincing to insist that the PREP Act merely displaces the remedy for a constitutional violation, as opposed to destroying the underlying right. As this Court has repeated for decades: "Where there is a right, there is a remedy. This is a foundational principle of every common law legal system, including ours." *Washington v. Cline*, 385 N.C. 824, 825, 898 S.E.2d 667, 668 (2024); *see also Von*

*Glahn v. Harris*, 73 N.C. 323, 332 (1875) (calling this a "time-honored maxim"). Constitutional rights and constitutional remedies are inseparable. The judiciary has a sacred duty to ensure it stays that way. *See Corum*, 330 N.C. at 783, 413 S.E.2d at 290 ("It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State.").

Textual interpretation seeks to give statutes their plain and ordinary meaning. Literalism is not proper textual analysis; we must reject readings that defy our common sense. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2379 (2023) (Barrett, J., concurring) ("Context also includes common sense, which is another thing that 'goes without saying.' Case reporters and casebooks brim with illustrations of why literalism—the antithesis of context-driven interpretation—falls short.").

Consider an example from our state constitution: Article I, Section 18 states in part that "[a]ll courts shall be open." N.C. Const. art I, § 18. Does this provision require that the courts operate twenty-four hours a day, seven days a week, and 365 days a year? Does it prohibit courts from closing during severe winter storms? Does it grant litigants an unconditional right to file, argue, and appeal frivolous claims? Of course not. Instead, we construe the provision's words in a manner that effectuates their plain purpose: to ensure that North Carolinians always have a forum to seek justice under the law. John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 65–66 (2d ed. 2013) [hereinafter *State Constitution*] ("Justice would be

-31-

available to all who were injured; to this end, the courts would be 'open.' The word meant not that the judges would sit round-the-clock or that every spectator would always be welcome, but that legal remedies would not be withheld.").

We must do the same with the PREP Act. Its plain text, like Article I, Section 18, is extremely broad. But it is not unlimited. "In [a preemption analysis], as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium*, 139 S. Ct. at 1900. We do not believe that the PREP Act intended to effectively erase deeply engrained and fundamental constitutional rights.

### b. *"All Claims for Loss"*

Nevertheless, it is unnecessary to fully develop the foregoing point because plaintiffs have a second convincing argument: that their state constitutional claims are not "claims for loss."[10] Again, we agree.

We presume that when the legislature enacts a statute, it intentionally includes and gives meaning to every word therein. *See State v. Geter*, 383 N.C. 484,

---

[10] A few days after oral argument in this case, the District of Utah issued an in-depth opinion considering the kinds of claims that satisfy the PREP Act's causal relationship element. *Dressen v. AstraZeneca AB*, No. 2:24-CV-00337, slip op. at 6–27 (D. Utah Nov. 4, 2024). The court held that the text of the PREP Act did not support extending the immunity to contract claims because contract claims, unlike tort claims, are not "*causally* related to the [PREP Act's] specified set of immunized activities." *Id.* at 15. Plaintiffs subsequently filed a memorandum of additional authority with this Court, citing *Dressen*. Because we hold that state constitutional claims are not "claims for loss," however, we do not address whether plaintiffs' claims "relat[e] to" the administration or use of a covered countermeasure. *See* 42 U.S.C. § 247d-6d(a)(1).

491, 881 S.E.2d 209, 214 (2022) (explaining the canon against surplusage); *accord Pulsifer v. United States*, 144 S. Ct. 718, 731–32 (2024). Although Congress could have applied the immunity to "all claims," it instead limited immunity to "all claims *for loss*." 42 U.S.C. § 247d 6d(a)(1) (emphasis added). That choice implies the existence of some subset of claims outside the immunity's reach because they are not "for loss."

The question therefore becomes what "loss" means. In paragraph (a)(2), entitled "Scope of Claims for Loss," the PREP Act itself gives the following definition:

> For purposes of this section, the term "loss" means any type of loss, including—
>
> (i)   death;
> (ii)  physical, mental, or emotional injury, illness, disability, or condition;
> (iii) fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and
> (iv)  loss of or damage to property, including business interruption loss.
>
> Each of clauses (i) through (iv) applies without regard to the date of the occurrence, presentation, or discovery of the loss described in the clause.

*Id.* § 247d-6d(a)(2)(A). Immediately after this definition, the statute explains that:

> [t]he immunity . . . applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing,

administration, licensing, or use of such countermeasure.

*Id.* § 247(d)-6d(a)(2)(B).

"When Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.' " *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 144 S. Ct. 457, 472 (2024) (quoting *Sturgeon v. Frost*, 587 U.S. 28, 56, 139 S. Ct. 1066, 1086 (2019)). Whereas we would normally look to the plain meaning of "loss" to understand how the legislature intended it, *see, e.g., N.C. Farm Bureau Mut. Ins. Co., Inc. v. Hebert*, 385 N.C. 705, 711, 898 S.E.2d 718, 724 (2024), we may not ignore the PREP Act's definition "merely because it 'varies from [the] term's ordinary meaning,' " *Kirtz*, 144 S. Ct. at 472 (alteration in original) (quoting *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160, 138 S. Ct. 767, 776 (2018)); *accord Sturdivant v. N.C. Dep't of Pub. Safety*, 909 S.E.2d 483, 490 (N.C. 2024) ("[I]t would be quite abnormal for the General Assembly to define a term and then decline to use that definition . . . . Doing so undermines the very reason that the General Assembly would add a statutory definition in the first place."). The PREP Act's definition controls, even if it conflicts with how we might ordinarily understand "loss."

Here the first part of the statutory definition, "the term 'loss' means any type of loss," is circular and thus unhelpful. Fortunately, the second part of the definition provides four examples of losses that tease out the word's meaning. We therefore begin with the second part of the definition and work backwards: first using the examples to understand "loss," then applying that understanding to interpret "any

type of loss."

Examples help limit the scope of words that might otherwise be subject to a wider interpretation. *See Begay v. United States*, 553 U.S. 137, 142, 128 S. Ct. 1581, 1585 (2008) ("If Congress . . . meant the statute to be all encompassing, it is hard to see why it would have needed to include the examples at all."), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551 (2015); *cf. Pulsifer*, 144 S. Ct. at 731–32 (explaining that the canon against surplusage "applies with special force" if ignoring it would "render[ ] an entire subparagraph meaningless" (alteration and quotation omitted)). The Supreme Court of the United States recently used a football analogy to explain this concept:

> [A] football league might adopt a rule that players must not "grab, twist, or pull a facemask, helmet, or other equipment with the intent to injure a player, or otherwise attack, assault, or harm any player." If a linebacker shouts insults at the quarterback and hurts his feelings, has the linebacker nonetheless followed the rule? Of course he has. The examples of prohibited actions all concern dangerous physical conduct that might inflict bodily harm; trash talk is simply not of that kind.

*Fischer v. United States*, 144 S. Ct. 2176, 2184 (2024).

The above reasoning aligns with a pair of related canons of statutory construction. First, *noscitur a sociis* provides that a word is better understood by considering the meanings of neighboring words. *Id.* at 2183–84. And second, *ejusdem generis* provides that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede

it."[11] *Id.* at 2184 (internal quotation marks and ellipses omitted). Together, these interpretative canons "track the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Id.*

When we apply that logic to the PREP Act's examples of loss—e.g., death, physical injury, and property damage—we conclude that each example is of the measurable and compensable type ordinarily associated with tort law. *See, e.g., Radiator Specialty Co. v. Arrowood Indem. Co.*, 383 N.C. 387, 407, 881 S.E.2d 597, 610–11 (2022) (using "loss" to refer to "property damage or bodily injury" (quoting Thomas M. Jones & Jon D. Hurwitz, *An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases*, 10 Vill. Envt'l L.J. 25, 37–38 (1999))); *Carey v. Piphus*, 435 U.S. 247, 257–58, 98 S. Ct. 1042, 1049–50 (1978) (discussing how the common law of torts assigns monetary value to injuries); *Loss, Black's Law Dictionary* (12th ed. 2024) (defining "loss" as a "disappearance or diminution of value"). The "sole exception" to the PREP Act's immunity, "an exclusive[ly] Federal cause of action

---

[11] Courts typically limit *ejusdem generis* to sequences in which a general catch-all term follows specific examples. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 203–05 (2012). In the PREP Act's case, however, the general term "loss" comes before the specific examples. Nonetheless, we apply the canon here in light of the Supreme Court's frequent warnings against construing a statute's preemptive reach too liberally. *See, e.g., Altria*, 555 U.S. at 76, 129 S. Ct. at 543; *cf. Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868, 120 S. Ct. 1913, 1918 (2000) ("We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances. Hence the broad reading cannot be correct.").

against a covered person for death or serious physical injury proximately caused by willful misconduct," further confirms that Congress viewed the immunity through a tort law lens, *see* 42 U.S.C. § 247d-6d(d)(1), as do the myriad examples of the immunity's scope, *see id.* § 247(d)-6d(a)(2)(B) (applying the immunity to claims for loss causally related to the "design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of" a covered countermeasure).

This limitation becomes even clearer upon considering the sentence immediately following the four tort-like examples: "Each of clauses (i) through (iv) applies without regard to the date of the occurrence, presentation, or discovery of the loss described in the clause." *Id.* § 247(d)-6d(a)(2)(A). It would be highly unusual to give a non-exhaustive list of examples of covered claims but then provide additional protection only to those supposedly illustrative examples. Given the tort-like examples and the subsequent sentence about the statutory scope, it makes more sense to interpret "all claims for loss" as all claims for *tort* loss—notwithstanding the apparently broad sweep of the word "including." *Cf. Samantar v. Yousuf*, 560 U.S. 305, 317, 130 S. Ct. 2278, 2287 (2010) ("[The u]se of the word 'include' can signal that the list that follows is meant to be illustrative . . . . But even if the list [here] is merely illustrative, it still suggests that 'foreign state' does not encompass [individuals], because the types of defendants listed are all entities.").

Loss under tort law, though serious in its own right, is not equivalent to loss in the constitutional sense. Tort law protects the people from each other under a system of sometimes arbitrary rules created by judges over a span of centuries. *See Carey*, 435 U.S. at 257–58, 98 S. Ct. at 1049–50. In contrast, the state constitution protects the people from their government, *Corum*, 330 N.C. at 782–83, 413 S.E.2d at 289–90, according to an order of natural rights far older than the document itself, *State Constitution* at 45 ("The drafters cautiously refer to the rights being 'defined and affirmed,' rather than created or conferred; the constitution, in other words, safeguards preexisting human rights, traceable . . . to the divinely ordained order of things." (quoting N.C. Const. pmbl.)). Indeed, as we detailed at length earlier in this opinion, the seriousness of a run-of-the-mill battery claim pales in comparison to the State's deliberate deprivation of one's fundamental constitutional liberties.

Because ordinary tort loss is distinct from constitutional loss, the tort-based examples included in the PREP Act suggest that Congress did not intend for the immunity to block state constitutional claims. *See Begay*, 553 U.S. at 142, 128 S. Ct. at 1585. Therefore, when the statute defines loss as "any type of loss," it means any type of tortious injury: physical injury, property damage, loss of use, and so on. Although that definition encompasses plaintiffs' battery claim, it does not cover their claims under the state constitution. The Court of Appeals erred in holding otherwise.

### 3. *Preemption of State Family Law*

The Supreme Court's historic reluctance to tamper with state family law

further supports our conclusion that the PREP Act does not preempt plaintiffs' state

constitutional claims predicated on Happel's right to control Smith's upbringing. The

parental right to control the upbringing of one's child lies directly at the intersection

of constitutional law and family law, and family law is "an area that has long been

regarded as a virtually exclusive province of the States." *Sosna v. Iowa*, 419 U.S. 393,

404, 95 S. Ct. 553, 559 (1975); *see also Haaland v. Brackeen*, 599 U.S. 255, 378, 143

S. Ct. 1609, 1687 (2023) (Alito, J., dissenting) ("No one denies that the States, at the

time of the adoption of the Constitution, possessed full power over ordinary family

relations; and the Constitution delegated no authority to the Government of the

United States in this area." (quotations omitted)).

In line with that history, the Supreme Court has explained its approach to

family law preemption as follows:

> We have consistently recognized that *the whole subject* of the domestic
> relations of husband and wife, *parent and child*, belongs to the laws of
> the States *and not to the laws of the United States*. On the rare occasion
> when state family law has come into conflict with a federal statute, this
> Court has limited review under the Supremacy Clause to a
> determination [of] whether Congress has *positively required by direct
> enactment* that state law be pre-empted.

*Rose v. Rose*, 481 U.S. 619, 625, 107 S. Ct. 2029, 2033 (1987) (emphases added)

(internal punctuation and citations omitted). State family law "must do major

damage to clear and substantial federal interests" before it may be preempted. *Id.* As

plaintiffs point out, shortly before Smith's vaccination, our General Assembly enacted

legislation recognizing a parent's right to control whether her child received a vaccine

under emergency use authorization.[12] Before medical providers may administer that kind of treatment, state law requires them to obtain written parental consent. *See* N.C.G.S. § 90-21.5(a1) (2023). By enacting the statute, the General Assembly directly exercised this State's "virtually exclusive" authority to regulate domestic relations. *See Sosna*, 419 U.S. at 404, 95 S. Ct. at 559.

It is difficult to see how our State's parental consent statute "do[es] major damage" to the "clear and substantial federal interests" contained in the PREP Act. *See Rose*, 481 U.S. at 625, 107 S. Ct. at 2033–34. Although the PREP Act clearly preempts tort law, its application to other areas of the law is at best speculative. *See The PREP Act and COVID-19* at 2 ("This language [about loss] seemingly includes, at a minimum, most state law tort, medical malpractice, and wrongful death claims arising from the administration of covered countermeasures."); *Dressen*, slip op. at 19–23 (denying vaccine manufacturer's motion to dismiss breach-of-contract case because the PREP Act's text was limited to "tort-like claims"); *Leonard v. Ala. State Bd. of Pharmacy*, 61 F.4th 902, 915 (11th Cir. 2023) ("With the text of the [PREP Act] pulling in one direction and Congress's purpose arguably pulling in the other, 'it is not absolutely clear to us, i.e., facially conclusive' that we should resolve this tension in favor of finding preemption [of an administrative claim]." (quoting *Hughes*

_____

[12] An Act to Authorize Immunizing Pharmacists to Dispense, Deliver, and Administer Certain Treatment and Medications and to Require Parental Consent for Administration of Vaccines Under an Emergency Use Authorization to a Minor, S.L. 2021 110, § 9, 2021 N.C. Sess. Laws 416, 419 (codified as amended at N.C.G.S. § 90-21.5(a1) (2023)).

*v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1271 (11th Cir. 2004))).[13]

Indeed, the HHS Secretary's declaration, which "controls the scope of the immunity . . . within the confines of the PREP Act," *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 401 (3d Cir. 2021), only provided tort-like examples of covered claims, *see Secretary's Declaration* at 15200 ("[T]he Act precludes, for example, liability claims alleging negligence by a manufacturer in creating a vaccine, or negligence by a health care provider in prescribing the wrong dose" or "a slip-and-fall injury or vehicle collision by a recipient receiving a countermeasure . . . ."). Nothing in the PREP Act "positively requires" state family law's preemption, *Rose*, 481 U.S. at 625, 107 S. Ct. at 2033, nor is there any evidence in the statute or declaration that the federal government intended to invade this "virtually exclusive province of the States," *Sosna*, 419 U.S. at 404, 95 S. Ct. at 559. That failure provides even more reason to conclude that Congress did not intend to preempt the state constitutional

---

[13] The Eleventh Circuit's opinion in *Leonard* addressed the clarity of the PREP Act as it related to *Younger* abstention, another federal jurisdictional doctrine not at issue in this case. That court's *Younger* abstention caselaw allows it to interfere with state court proceedings in "only the clearest of federal preemption claims." *Leonard*, 61 F.4th at 913 (quoting *Hughes*, 377 F.3d at 1265). But regardless of the precise reason for the court's evaluation of the PREP Act's preemptive clarity, its ultimate conclusion—that the PREP Act only clearly preempts tort claims—is relevant here to support our conclusion that the Act does not demonstrate a clear and substantial interest in preempting state family law. *See id.* at 915 ("[T]he few cases to have addressed PREP Act preemption have generally concluded that state tort law is preempted with respect to the administration of covered countermeasures." (citing *Parker*, 954 N.Y.S.2d 259)).

claims plaintiffs bring in this case.[14]

## C. Precedents from Other Jurisdictions

Defendants point to several cases from other jurisdictions that they believe to be on point here and support dismissal. These decisions include the trio of cases cited by the Court of Appeals—*Parker*, *Cowen*, and *M.T.*—as well as the Vermont Supreme Court's ruling in *Politella v. Windham Southeast School District*, issued in between the Court of Appeals' decision and oral argument at this Court. Defendants also cite *Maney v. Brown*, in which the Ninth Circuit held that federal constitutional claims brought under 42 U.S.C. § 1983 were claims "for loss" under the PREP Act. 91 F.4th 1296, 1303 (9th Cir. 2024). None of the cited cases persuade us that the PREP Act preempts claims brought under our state constitution.

### 1. *Parker, Cowen, and M.T.*

First, we consider each of the decisions cited by the Court of Appeals

---

[14] Even in the rare instances where the Supreme Court has held that Congress validly preempted family law, the statutes in question regulated either "the economic aspects of domestic relations" or the welfare of Indian children. *See Haaland*, 143 S. Ct. at 1630 (collecting cases); *see also id.* at 1687 (Alito, J., dissenting) ("[Until *Haaland*, the Supreme Court had] never held that Congress under any of its enumerated powers may regulate the very nature of [domestic] relations . . . . Nor could we and remain faithful to our founding.").

Those caveats do not apply here. In *Haaland*, the Supreme Court upheld the constitutionality of the Indian Child Welfare Act, a federal law requiring state family courts "to place an Indian child with an Indian caretaker, if one is available." *Id.* at 1622. While the plaintiffs there made several constitutional arguments, including one based on the Supreme Court's traditional reluctance to find family law preempted, *Haaland*'s reasoning primarily focused on Congress's plenary authority to regulate Indian affairs. *See id.* at 1627 (collecting cases); *see also* U.S. Const. art. I, § 8, cl. 3. The Supreme Court did, however, note that "the Constitution does not erect a firewall around family law." *Haaland*, 143 S. Ct. at 1630.

meaningfully distinguishable from the instant case. The plaintiffs in *Parker* and *Cowen*, for instance, did not bring constitutional claims. Instead, they only brought tort claims that fit comfortably within the PREP Act's tort-based examples of loss. *See Parker*, 954 N.Y.S.2d at 260–61 (bringing state law claims for negligence and battery); *Cowen*, slip op. at 3 (bringing state law claims for negligence and vicarious liability).

Similarly, while the plaintiff in *M.T.* alleged a violation of her parental rights, she did not raise a constitutional issue, nor did the court there consider one. *M.T.*, 528 P.3d at 1084 ("Because this case can be decided on the text of the Act and [the plaintiff] never advanced any constitutional claim, we adhere to the long-standing doctrine of judicial self-restraint known as constitutional avoidance."). Moreover, the minor in *M.T.*, unlike Smith, wanted to be vaccinated. *Id.* at 1071. Defendants particularly stress one sentence from *M.T.*: "In other words, [immunity from] 'all claims' means all claims, not 'all claims except for those based on a violation of a fundamental right.' " *Id.* at 1083. As discussed above, however, the PREP Act does not cover "all claims." It covers "all claims *for loss*." In sum, these three cases do not support dismissal of plaintiffs' constitutional claims here.

### 2. *Politella*

Nor do we believe the Vermont Supreme Court's decision in *Politella* to be on point. That case, like this one, involved a lawsuit brought by the parents of a child whose school vaccinated him against the parents' will. *Politella*, 325 A.3d at 92. The

plaintiffs asserted various tort claims against their son's school district and later added a state constitutional claim in an amended complaint. *Id.* In holding that the PREP Act completely immunized the defendants, the court did not distinguish the plaintiffs' constitutional claim from their other state law claims. *See id.* at 97–98. As justification, the court summarily cited the PREP Act's preemption provision and the decisions of "[o]ther state courts faced with similar facts"—specifically, *M.T.*, *Parker*, and our Court of Appeals' *Happel* opinion. *See id.* at 98. But as previously noted, *M.T.* and *Parker* do not apply here because they did not consider constitutional claims. And given our de novo standard of review, we afford no independent weight to the opinion of our Court of Appeals. Defendants' reliance on *Politella* is misplaced.

### 3. *Maney*

Finally, we are unpersuaded by the Ninth Circuit's decision in *Maney* for several reasons. First, and perhaps most importantly, *Maney* did not address preemption of state law. The plaintiffs there brought federal constitutional claims via a federal procedural vehicle, section 1983,[15] and the defendants asserted immunity under another federal statute, the PREP Act. *Maney*, 91 F.4th at 1302. "Congress . . . may specifically foreclose a remedy under [section] 1983," *id.* (alteration and quotation omitted), much like it can preempt state law. But courts

---

[15] Section 1983 permits a plaintiff whose federal constitutional rights have been harmed by a person acting "under color of" state law to hold that person liable "in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. "The law regarding the interpretation of [s]ection 1983 is labyrinthine," as this Court once noted. *Corum*, 330 N.C. at 770, 413 S.E.2d at 282.

analyze these actions differently. *See id.* (discussing how courts determine whether "Congress intended to preclude reliance on [section] 1983 as a remedy for the deprivation of a *federally* secured right" (emphasis added) (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1114 (9th Cir. 2004))). Because Congress enacted both section 1983 and the PREP Act, the latter statute can restrict the former without raising preemption concerns.

The same is not true of this case. This Court has explained that our state constitution confers a direct cause of action to remedy constitutional harms. *Corum*, 330 N.C. at 782, 413 S.E.2d at 289. North Carolinians seeking to vindicate their state constitutional rights do not need to rely on a procedural mechanism like section 1983 to enter the courthouse doors; if state law does not already provide an "adequate remedy" for a constitutional violation, the judicial branch will use its "inherent constitutional power" to fashion one. *Id.* at 784–85, 413 S.E.2d at 291; *see also* N.C. Const. art. IV (describing the judicial power). Indeed, we have explicitly noted that *Corum* claims are "not [the] state law equivalent of [section] 1983" in numerous respects. *Washington*, 385 N.C. at 830, 898 S.E.2d at 672. "Simply put, *Corum* is the embodiment of 'where there is a right, there is a remedy.' . . . [It] creates a common law cause of action." *Id.*

Moreover, *Maney* couched its reasoning and conclusion in less-than-definite terms. It first noted that the PREP Act covers "all claims for loss," *Maney*, 91 F.4th at 1302, and then asserted that "[t]he use of 'all' indicates a sweeping statutory

reach," *id.* (quoting *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 690–91 (9th Cir. 2022)). Its language, however, became progressively less forceful: "Of course, the PREP Act limits the scope of covered claims to those related to the administration or use of covered countermeasures. But that limitation *does not categorically exclude* constitutional claims." *Id.* at 1302–03 (emphasis added). The opinion then stated that the PREP Act's one exception to immunity—the exclusive federal cause of action in section 247d-6d(a)—"*may* provide a remedy for [federal] constitutional claims that involve willful misconduct, as defined by the Act. But that exception *does not categorically exempt* federal constitutional claims from the Act's protection." *Id.* at 1303 (emphases added).

This Court understands the statute's lack of a categorical exemption for constitutional claims to mean something much different, and *Maney* is far from a definitive rejection of this Court's theory. The PREP Act's inclusion of the words "for loss" must be given meaning; the plain text of the statute leads us to conclude that Congress did not intend to preempt state constitutional claims.

## III. Conclusion

We hold that the plain text of the PREP Act does not bar claims brought under our state constitution. On remand, the Court of Appeals should decide the remaining state constitutional issues raised by the parties in their briefs to that court. These questions include whether plaintiffs' complaint sufficiently alleged that defendant ONSMS was a state actor and whether plaintiffs have an adequate state remedy

available for their constitutional claims. *See generally Corum*, 330 N.C. 761, 413 S.E.2d 276; *see also, e.g., Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 340, 678 S.E.2d 351, 355 (2009); *Deminski*, 377 N.C. at 413, 858 S.E.2d at 793; *Washington*, 385 N.C. at 829–30, 898 S.E.2d at 671–72; *Kinsley*, 904 S.E.2d at 729–30.

"The [state] constitution is our foundational social contract and an agreement among the people regarding fundamental principles." *Harper*, 384 N.C. at 297, 886 S.E.2d at 398. "The people speak through the express language of their state constitution . . . ." *Id.* In Article I, Section 18 of their state constitution, the people declared, "All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay." N.C. Const. art. I, § 18. The express language of this provision unambiguously demands that we allow plaintiffs to seek constitutional remedies here. We lack evidence of the clear and manifest congressional intent that would require us to do otherwise.

The decision of the Court of Appeals is affirmed with respect to plaintiffs' battery claim, reversed with respect to their state constitutional claims, and remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Justice BERGER concurring.

I concur fully in the majority opinion as "forced medication [is] a battery, and the[re is a] long legal tradition protecting the decision to refuse unwanted medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997). That legal tradition is rooted in the Lockean notion of self-ownership – that bodily autonomy is the height of personal freedom and fundamental property rights, provided however that your actions do not harm others. *See* John Locke, *Two Treatises of Government* (each individual "has a Property in his own Person. This no Body has any Right to but himself.").

I write separately to note that the sweeping grant of immunity in the PREP Act seems contrary to this basic understanding. The government's reading of the Act appears to override state consent laws such that intentional torts may be cloaked with immunity when the harm inflicted falls short of death or serious physical injury. *See* 42 U.S.C. § 247d-6d(d)(1). But shouldn't immunity under the PREP Act be predicated on a lawful administration of a covered countermeasure?

Consider the following: you're waiting for your morning coffee at the local café. While standing with other customers, a healthcare official authorized to administer a covered countermeasure walks in and injects everyone in the coffee shop without asking or otherwise obtaining consent. All have been the victim of a battery. But

under the government's reading of the PREP Act, unless death or serious physical injury results, the healthcare worker has blanket immunity for these intentional acts.

Common sense tells us that although the grant of immunity under the Act is broad, it is not limitless. The statute on its face appears to encourage beneficial conduct. However, the PREP Act could be understood as immunizing forcible administration of medication similar to the scenario described above, if not worse. Given the fundamental principles articulated by Locke and echoed in *Glucksberg*, it is difficult to concede that the PREP Act confers immunity for outright wrongful acts.

Justice BARRINGER joins in this concurring opinion.

Justice RIGGS dissenting.

Self-described textualists and originalists have historically professed to avoid "turn[ing] somersaults" to reach particular interpretations of the written law. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 325 (2008). The majority here should abandon any such pretense; through a series of dizzying inversions, it explicitly rewrites an unambiguous statute to exclude state constitutional claims from the broad and inclusive immunity "from suit and liability under Federal and State law with respect to all claims for loss" established by the Public Readiness and Emergency Preparedness Act (PREP Act). 42 U.S.C. § 247d-6d(a)(1). The majority also recognizes two implied fundamental state constitutional rights—one arbitrarily defined without any apparent principle—a right to bodily integrity divorced from bodily autonomy—and the other defined in principle but applied arbitrarily—the right of parents to direct the raising of their children. So, while I agree that the constitution protects rights to bodily integrity and those of parents to care for their children, I cannot concur in their articulation here. Because I find both the PREP Act and constitutional analyses fundamentally unsound, I respectfully dissent.

In the first of many backflips, the majority starts by assuming—and then, questionably, by announcing—the existence of two unenumerated state constitutional rights before turning to the question of whether the PREP Act establishes immunity from claims under *Corum v. Univ. of N.C.*, 330 N.C. 761 (1992).

*See* majority *supra* Section II (starting its substantive analysis by "assum[ing] without deciding that plaintiffs present adequate '*Corum* claims' for violations of their constitutional rights" before explicitly recognizing two such constitutional rights, detailing their contours, and proceeding to exempt them from immunity under the PREP Act). I will begin where the majority should have started: first addressing whether the PREP Act immunizes defendants from the "suit and liability" asserted in this case. 42 U.S.C. § 247d-6d(a)(1); *see* majority *supra* Section II.B. (recognizing that "if defendants are correct that Congress fully barred plaintiffs' claims, the state constitution would have no practical effect on this case's outcome."). And, because I believe that the PREP Act does so immunize the defendants, the analysis would ordinarily stop there. *See, e.g., Anderson v. Assimos*, 356 N.C. 415, 416 (2002) ("[T]he courts of this State will avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds."). But, because the majority erroneously decides that question and goes further to resolve these constitutional issues, I will then explain my disagreement with its treatment of those rights.

## I.    PREP Act Applicability

I agree with the majority that "congressional purpose [is] 'the ultimate touchstone'" in determining whether the PREP Act's grant of immunities is intended to preclude state constitutional claims. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 545 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part) ("The ultimate question in each [pre-emption] case, as we have framed the inquiry, is

one of Congress's intent, as revealed by the text, structure, purposes, and subject matter of the statutes involved." (citations omitted)). Shockingly absent from the majority opinion's interpretive analysis, however, is any substantive engagement with what the PREP Act was intended to achieve or accomplish and, between its prefatory praise of implied constitutional rights and the genius of federalism,[1] one might come away from that opinion with the impression that Congress's primary concern was with protecting state constitutional rights from federal intrusion. This, however, is manifestly not the case.

## A. The PREP Act's Purposes and Full Context

The 109th Congress and the George W. Bush administration had one key objective in passing and signing the PREP Act:

> Congress enacted the PREP Act in 2005 "[t]o encourage the expeditious development and deployment of medical countermeasures during a public health emergency" by allowing the HHS Secretary "to limit legal liability for losses relating to the administration of medical countermeasures such as diagnostics, treatments, and vaccines."

*Cannon v. Watermark Ret. Cmtys., Inc.*, 45 F.4th 137, 139 (D.C. Cir. 2022) (alteration in original) (quoting Kevin J. Hickey, Cong. Rsch. Serv., LSB10443, *The PREP Act and Covid-19, Part 1: Statutory Authority to Limit Liability for Medical*

---

[1] After recounting the factual and procedural background of the case, the majority engages in a remarkable *18 pages* of discussion of these subjects before returning to any analysis of the PREP Act—the act that, by the majority's own recognition, presents the dispositive issue in this appeal.

*Countermeasures* 1 [hereinafter *The PREP Act and COVID-19*]). The PREP Act's "scope of immunity is broad," *Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 401 (3d Cir. 2021), and for good reason: "In the PREP Act, Congress made the judgment that, in the context of a public health emergency, immunizing certain persons and entities from liability was necessary to ensure that potentially life-saving countermeasures will be efficiently developed, deployed, *and administered*," *The PREP Act and COVID-19* at 1 (emphasis added).

The text of the PREP Act makes clear that Congress intended this protection to apply in an almost universal[2] fashion. In describing the laws preempted under its provisions, the PREP Act provides, in relevant part:

> [A]t *any* time with respect to conduct undertaken in accordance with [an emergency] declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure *any* provision of law or legal requirement that—
>
> (A)   is different from, or is in conflict with, *any* requirement applicable under this section; and
>
> (B)   relates to . . . the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to *any* matter included in a requirement applicable to the covered countermeasure under this section . . . .

42 U.S.C. § 247d-6d(b)(8) (emphases added). Usage of the unambiguous word "any" throughout this section shows a plain and clear intention to preempt and immunize

---

[2] As detailed herein, "[t]here is *one* exception to this statutory immunity." *Maglioli*, 16 F.4th at 401 (emphasis added).

against *all* causally linked State law claims for loss that conflict with the PREP Act, regardless of whether they sound in tort, equity, a state constitution, or any other source of redressable rights. The terms of art employed by Congress are likewise expansive; as the Supreme Court of the United States has recognized, the federal legislature resorts to the term "requirement" to describe "a rule of law that must be obeyed," *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445 (2005), a meaning which "reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties," *id.* at 443. *See also Cipollone,* 505 U.S. at 521 (plurality opinion) ("The phrase 'no requirement or prohibition' sweeps broadly." (cleaned up)); *id.* at 548–49 (Scalia, J., concurring in the judgment in part and dissenting in part). The same is true of other language here and elsewhere in the PREP Act. *See, e.g., Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95–96 (2017) ("Congress' use of the expansive phrase 'relate to' shores up that understanding. We have repeatedly recognized that the phrase 'relate to' in a preemption clause expresses a broad pre-emptive purpose." (cleaned up)).

The text of the immunity provision reinforces the PREP Act's wide preemptive and inoculating reach. It broadly provides that:

> [A] covered person shall be immune *from suit and liability* under *Federal and State law* with respect to *all* claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration . . . has been issued with respect to such countermeasure.

42 U.S.C. § 247d-6d(a)(1) (emphases added). From there, in subsection (a)(2), titled "Scope of claims for loss," it continues to define "loss" *in outright expansive and strictly inclusive terms*:

> (A) Loss
>
> For purposes of this section, the term "loss" means *any* type of loss, *including*—
>
>> (i) death;
>>
>> (ii) physical, mental, or emotional injury, illness, disability, or condition;
>>
>> (iii) fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and
>>
>> (iv) loss of or damage to property, including business interruption loss.
>
> Each of clauses (i) through (iv) applies without regard to the date of the occurrence, presentation, or discovery of the loss described in the clause.

*Id.* § 247d-6d(a)(2)(A) (emphases added); *see also Fed. Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' *is not one of all-embracing definition*, but connotes simply an illustrative application of the general principle." (emphasis added)).

It is the next subsection, subsection (a)(2)(B), "Scope," that limits the reach of the expansive immunities against *any* losses—albeit, and importantly, in a very proscribed fashion—by imposing a causality requirement:

> The immunity under paragraph (1) applies to *any* claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, *including* a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure.

*Id.* § 247d-6d(a)(2)(B) (emphases added).[3]

This clear trend towards the expansive continues in the identification of those granted immunity. *Anyone, anywhere,* connected *in any way* to the development, deployment, and administration of the covered countermeasure pursuant to the declaration is covered by the PREP Act. A "covered person" is defined as:

> (A) the United States; or

> (B) a person or entity that is-

>> (i) a manufacturer of such countermeasure;

>> (ii) a distributor of such countermeasure;

>> (iii) a program planner of such countermeasure;

>> (iv) a qualified person who prescribed, administered, or dispensed such countermeasure; or

>> (v) an official, agent, or employee of a person or entity described in clause (i), (ii), (iii), or (iv).

---

[3] This singular causality limitation is reinforced by the subsection that immediately follows, which states that immunity only applies to covered countermeasures when: (1) delivered during a declaration, (2) in connection with the public health threat identified therein, and (3) in the case of program planners or countermeasure administrators, to a population and geographic area subject to the declaration. 42 U.S.C. § 247d-6d(a)(3), (4).

*Id.* § 247d-6d(i)(2).  Driving the point home that the PREP Act is intended to cut across all jurisdictions and through any divisions between the public and private sectors, Congress also expressly eliminated any distinctions between natural persons, private corporations and entities, and government agents of any level: "The term 'person' includes an individual, partnership, corporation, association, entity, or public or private corporation, including a Federal, State, or local government agency or department." *Id.* § 247d-6d(i)(5).

Notwithstanding "the breadth of the preemption clause[,] . . . the sweeping language of the statute's immunity provision," *Parker v. St. Lawrence Cnty. Pub. Health Dep't*, 954 N.Y.S.2d 259, 262 (N.Y. App. Div. 2012), and the obvious expansiveness of the other provisions discussed *supra,* Congress included "*one exception to this statutory immunity*," *Maglioli*, 16 F.4th at 401 (emphasis added), where the desire to ensure robust participation—across the public and private sectors and between all levels of government—in response to a nationwide public health emergency gave way to the need to punish bad actors and allow recovery for injured parties.  That "sole exception to the immunity from suit and liability . . . [is] an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct," 42 U.S.C. § 247d-6d(d)(1), and it denotes not only the obvious expansiveness of the PREP Act's intended reach, but also the extremely limited nature of the intended exclusion.  Congress enacted this singular narrow exception alongside another form of relief—the Covered

Countermeasure Process Fund, 42 U.S.C. § 247d-6e—plainly weighing the need to enact a sweeping immunity and preemption regime against a limited avenue for full litigatory redress and the availability of compensation through the Fund.

The majority functionally ignores most of these provisions, and it's easy to see why: "The text of the preemption provision must be viewed in context, with proper attention paid to the history, structure, and purpose of the regulatory scheme in which it appears." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 529 (2001) (Stevens, J., concurring in part, concurring in the judgment in part, and dissenting in part); *see also Cipollone,* 505 U.S. at 545 (Scalia, J., concurring in the judgment in part and dissenting in part). That context includes both the intention behind the act and the preemption clause's presence in the wider legislative scheme. *See Riegel*, 552 U.S. at 324–25 (refusing to narrowly construe a preemption provision to exclude common law claims because, "in the context of this legislation excluding common-law duties from the scope of pre-emption would make little sense"); *id.* at 325 ("That perverse distinction [between regulatory laws and common law claims] is not required or even suggested by the broad language Congress chose in the [act]."); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (recognizing "the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (cleaned up)).

Indeed, it is not possible to square the majority's reading with the purposes of the PREP Act and the almost uniformly broad language used to effectuate it.[4] Allowing plaintiffs to skirt around the immunity granted by the PREP Act by simply recasting their otherwise-preempted claims as state constitutional injuries would create a glaring loophole that undermines the very protections Congress intended to provide.[5] Elevating a claim's form over its substance to avoid the application of a preemption provision—especially when it frustrates the purpose of the overall act—is plainly contrary to law. *See Riegel*, 552 U.S. at 325 (declining to adopt a distinction between state regulatory and tort law for purposes of an express preemption provision because "[s]tate tort law . . . [could] disrupt[ ] the federal scheme no less than state regulatory law"). To analogize to the Supreme Court of the United States'

---

[4] The majority suggests, in citing to and relying on *Leonard v. Ala. State Bd. of Pharmacy*, 61 F.4th 902, 915 (11th Cir. 2023), that recognizing a broad grant of immunity somehow works against the aims of the PREP Act. Contrary to the majority's assertion, *Leonard*'s very limited reference to tort claims is distinguishable and not persuasive here for more reasons than just the involvement of *Younger* abstention. In that case, the Eleventh Circuit recognized that the PREP Act seeks to "encourage the administration of covered countermeasures," and yet the state was attempting to impose licensing discipline on a medical provider for actions involving administration of those covered countermeasures. *Leonard,* 61 F.4th at 915 (cleaned up). The *Leonard* court therefore acknowledged that it "would seem odd for Congress to immunize covered persons from private suits for damages, while still subjecting them to government administrative actions seeking to revoke their licenses for the same conduct." *Id.* That tension—where "the text of the statute [is] pulling in one direction and Congress's purpose [is] arguably pulling in the other," *id.*—is simply not present in this case.

[5] Consider, for example, our state constitution's Fruits of Their Own Labor Clause. Allowing a party to recast an injury otherwise preempted by the PREP Act under that constitutional clause would run headlong into the PREP Act's bar against suit and recovery for "loss of or damage to property, *including business interruption loss.*" 42 U.S.C. § 247d-6d(a)(2)(A)(iv) (emphasis added).

interpretation of another federal preemption statute in the Airline Deregulation Act, which sought to curtail state and federal regulation of the airline industry:

> Exempting common-law claims would also disserve the central purpose of the ADA. . . . What is important . . . is the effect of a state law, regulation, or provision, not its form, and the ADA's deregulatory aim can be undermined just as surely by a state common-law rule as it can by a state statute or regulation.

*Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014) (citation omitted). Likewise, constitutional claims—just as much as tort claims—frustrate Congress's intent in enacting the PREP Act to "immuniz[e] certain persons and entities from liability" in order to "ensure that potentially life-saving countermeasures will be efficiently developed, deployed, and administered." *The PREP Act and COVID-19* at 1. That the majority would allow such a result for a constitutional right to bodily integrity *that it explicitly ties* to "common-law battery" and "the American tort law rule that medical treatment generally requires the patient's informed consent," only heightens the absurdity.

## B. The Majority's Reversed Reading and Misapplied Presumptions

Rather than confront this reality, the majority quite literally reasons backwards to avoid it. It does so, it says, because "the first part of the statutory definition, " 'loss' means any type of loss,' is circular and thus unhelpful." But this attempt at lawyerly sleight of hand is as clumsy as it is unconvincing.

Black's Law Dictionary has historically "defined over 30 types of loss, including 'capital loss,' 'economic loss' and 'passive loss.'" *United States v. Boler*, 115 F.4th 316,

330 n.1 (4th Cir. 2024) (Quattlebaum, J., dissenting) (quoting Black's Law Dictionary (6th ed. 1990)). By my count, the definition of "Loss" from Black's Law Dictionary cited by the majority identifies *42* different types of loss. *Loss*, Black's Law Dictionary (12th ed. 2024). And this generally assumes that "loss" is being used as a term of art, *Boler*, 115 F.4th at 330 n.1 (Quattlebaum, J., dissenting); the ordinary meaning of "loss" further expands the word's potential reach, and the "multiple and varied [ordinary] definitions . . . demonstrate that 'loss' could mean a number of different things depending on the dictionary of one's choice," *id.* at 324–25. "[T]here is no single right answer to the meaning of 'loss' based on its plain reading." *Id.* at 325. Congress resolved this ambiguity in the simplest, most straightforward way possible: by stating "loss means *any type* of loss." 42 U.S.C. § 247d-6d(a)(2)(A) (emphasis added). With this ambiguity eliminated by the PREP Act's plain language, there's no need to reinject uncertainty into the statutory text by reading the clause in reverse.[6]

The majority's solutions to its entirely reinvented ambiguity are, for those of a certain generation, reminiscent of Homer Simpson's declaration—famously shouted from the bottom of a hole—that "we'll dig our way out!" The majority first asserts that the entire (and entirely unnecessary) interpretive exercise should begin with the "starting presumption that Congress does not intend to supplant state law." Majority

---

[6] There is no meaningful analytical analogy between this section of the PREP Act—which expressly and unambiguously defines "loss," 42 U.S.C. § 247d-6d(a)(2)(A)—and the undefined usage of the term "open" in our state constitution, N.C. Const. art I, § 18. And, as explained below, the purported nonsensical results that the majority rely upon to draw its connection simply do not exist in this case.

*supra* Section II.B.1. (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995)).  But the Supreme Court's more recent precedents clarify that such presumptions do not apply where the act contains an express preemption clause.  *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) ("[B]ecause the statute 'contains an express pre-emption clause,' we do not invoke *any* presumption against pre-emption." (cleaned up) (emphasis added)); *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (recognizing that "the Supreme Court has since changed its position on the presumption against preemption where there is an express preemption clause").  In other words, where there is an express preemption clause and a court is tasked with discerning whether it applies to a particular law, we now engage in a "textual analysis without any presumptive thumb on the scale for or against preemption."  *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024) (cleaned up); *see also Daniels v. Exec. Dir. of Fla. Fish and Wildlife Conservation Comm'n*, No. 23-13577, slip op. at 16 (11th Cir. Feb. 6, 2025) (observing that under current Supreme Court precedent, "where Congress has enacted an express-preemption provision, we identify the state law that it preempts according to ordinary principles of statutory interpretation, and no presumption against preemption applies" (cleaned up)).  It makes little sense, then for the majority to depart from traditional limitations on *ejusdem generis*—which ordinarily constrain the doctrine "to sequences in which a general catch-all term follows specific examples"—because of now-outdated Supreme

Court decisions' "frequent warnings against construing a statute's preemptive reach too liberally."[7]

The majority also purports to rely on a presumption against preemption of family law and, because the parental consent in N.C.G.S. § 90-21.5(a1) (2023) apparently does not seriously impede the PREP Act, the Act should thus not be read

---

[7] As the majority notes, there is a disagreement—an overwhelmingly lopsided one— as to the full effect of *Franklin*. With a single exception, every federal circuit to have addressed the question, including our own, has given the text of *Franklin* its full due by declining to employ any presumptions regarding preemption when a federal statute contains an express preemption clause. *See Atay v. County of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (recognizing no presumptions when an express preemption clause exists); *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017) (same); *Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017) (same); *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018) (same); *Dialysis Newco*, 938 F.3d at 258 (same); *Medicaid and Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández*, 58 F.4th 5, 11–12 (1st Cir. 2023) (same); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (same); *Ye v. GlobalTranz Enters.*, 74 F.4th 453, 465 (7th Cir. 2023) (same); *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2nd Cir. 2023) (same). *But see Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (declining, in a footnote, to extend *Franklin* outside the bankruptcy context); *Lupian v. Joseph Cory Holdings, LLC*, 905 F.3d 127, 131 n.5 (3d Cir. 2018) (same).

State court caselaw is similarly imbalanced in favor of a broad application of *Franklin*. *See Conklin v. Medtronic, Inc.*, 431 P.3d 571, 504 (Ariz. 2018) (recognizing *Franklin* extinguished any presumptions against preemption where the statute contains an express preemption clause); *Griffioen v. Cedar Rapids and Iowa City Ry. Co.*, 914 N.W.2d 273, 281 (Iowa 2018) (same); *Snyder v. Prompt Med. Transp., Inc.*, 131 N.E.3d 640, 652 (Ind. Ct. App. 2019) (same); *BNSF Ry. Co. v. Eddy*, 459 P.3d 857, 865 (Mont. 2020) (same); *X-Gen Pharm., Inc. v. Dep't of Fin. and Prof'l Regulation*, 224 N.E.3d 825, 829 (Ill. App. Ct. 2022) (same); *Quishenberry v. UnitedHealthcare, Inc.*, 532 P.3d 239, 243 (Cal. 2023) (same). *Cf. City of Weyauwega v. Wis. Central Ltd.*, 919 N.W.2d 609, 617 (Wis. Ct. App. 2018) (declining to address whether *Franklin* squarely extinguished presumptions against preemption, but noting that the presumption applies "with considerably reduced (if any) force in cases in which there is an express preemption clause" (citations omitted)); *Hendrix v. United Healthcare Ins. Co. of the River Valley*, 327 So.3d 191, 204 (Ala. 2020) (noting, without deciding, that other courts have extended *Franklin* beyond the bankruptcy context). *But see FMS Nephrology Partners N. Cent. Ind. Dialysis Ctrs., LLC v. Meritain Health, Inc.*, 144 N.E.3d 692, 702 (Ind. 2020) (declining to expressly extend *Franklin* to ERISA preemption). Indeed, no state court has relied on *Shuker* or *Lupian* as the majority does here.

preemptively here. But this fundamentally confuses the issue presented by this case. The PREP Act does not expressly seek to preempt the state constitutional rights of parents to care for their children, but it does explicitly seek to foreclose any vehicle to sue or recover for violation of those rights when caused by a covered person administering a covered countermeasure in connection with a PREP Act declaration. *See* 42 U.S.C. § 247d-6d(a)(1) ("[A] covered person shall be immune from suit or liability under Federal and State law with respect to all claims for loss . . . ."). Of course N.C.G.S. § 90-21.5(a1) does no violence to the immunity provisions of the PREP Act—the state statute does not purport to convey any private right of action whatsoever. As for whether that law statutorily reflects a state constitutional right of parents, that right is only vindicated through litigation pursuant to *Corum*. Said differently, this case does not ask us to determine whether covered persons were still legally required by state law to seek parental consent in light of the PREP Act; instead, we have been asked to decide whether plaintiffs can sue to recover for any conduct that violated state constitutional law. So, what's actually preempted in this case is not state family law, but *Corum*. To the extent the statute also provides a basis for common law battery—as pleaded by plaintiffs in their complaint—that claim is barred even under the majority's interpretation, *see* majority *supra* Section II.B.2.b. (holding the majority's definition "encompasses plaintiffs' battery claim").

As to whether N.C.G.S. § 90-21.5(a1)'s requirement for parental consent could be preempted by the other provisions of the PREP Act, we need not decide that

question. But, contrary to the majority's representations, there are certainly instances in which that state statute could manifestly frustrate the Act, such as a PREP Act declaration in response to a nationwide medical emergency that was particularly deadly or dangerous to children. Moreover, it is not entirely clear that the statute is of the type of state "family law" that is generally seen as the exclusive province of the states as opposed to a statute that is principally related to medical treatment. Indeed, the federal government already legislates in the arena of medical treatment, including in the context of minors' consent for treatment and the confidentiality thereof. *See, e.g.,* 42 C.F.R. § 59.10(b) (2022) ("Title X projects may not require consent of parents or guardians for the provision of services to minors."); 45 C.F.R. § 164.502(g)(5) (2022) (establishing certain circumstances in which HIPAA precludes parents from accessing medical records of their unemancipated children). And N.C.G.S. § 90-21.5 is not located in our family law or juvenile welfare statutes, *see, e.g.,* N.C.G.S. §§ 7B-100 through -4002 & 50-2 through -11 (2023), but in Chapter 90, which regulates "Medicine and Allied Occupations," N.C.G.S. §§ 90-1 through -747 (2023).

## C. The Majority's Backwards Understanding of "Including"

No more convincing is the majority's claim that treating a list *of expressly illustrative examples* as such somehow serves to render those examples meaningless. Again, Congress may use explanatory, illustrative lists without presumptively constraining the broader category it intends to illustrate. *See Fed. Land Bank*, 314

U.S. at 100 ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."). Indeed, "the word 'including' does not lend itself to such destructive significance." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 189 (1941). And when Congress does intend the word "including" to have some limiting effect, it generally does so by constraining the *illustrated* items, not the broader category that precedes them. *See Massachusetts v. EPA*, 549 U.S. 497, 556–57 (2007) (Scalia, J., dissenting) ("The word 'including' can indeed indicate that what follows will be an 'illustrative' sampling of the general category that precedes the word. Often, however, the examples standing alone are broader than the general category, and must be viewed as limited in light of that category." (citation omitted)).

Even treating the inclusive list as surplusage does not lead the majority to the result it wants. "Sometimes the better overall reading of the statute contains some redundancy." *Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019). This is particularly true when, as here, the proponent of a particular interpretation uses the canon against surplusage to *insert* ambiguity into otherwise plain text rather than to resolve any inherent lack of clarity. For example, in a case interpreting the statutory term "attorney," the Supreme Court observed:

> Where there are two ways to read the text—either attorney is surplusage, in which case the text is plain; or attorney is nonsurplusage[,] . . . in which case the text is ambiguous— applying the rule against surplusage is, absent other indications, inappropriate. We should prefer the plain meaning since that approach respects the words of

Congress.  In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history.

*Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004).

## D. The Majority's Other Various Illogical Arguments

Ignoring the command that "our constitutional structure does not permit [courts] to rewrite the statute that Congress has enacted," *Franklin*, 579 U.S. at 130, the majority decides to employ canons of construction to conjure up an ambiguity where none otherwise exists,[8] partly out of a recognition that "[l]oss under tort law, though serious in its own right, is not equivalent to loss in the constitutional sense." A fair enough observation, but one that raises more questions in this context than it answers.  It is ostensibly true that tort losses are more immediately quantifiable in the monetary sense than constitutional ones, but it is certainly not apparent that, in enacting the PREP Act, Congress was exclusively concerned with shielding covered persons from paying monetary damages.  The grant of immunity is two-fold, conferring both immunity "from suit *and* liability."  42 U.S.C. § 247d-6d(a)(1) (emphasis added). The duality of the immunities afforded matters: "immunity from liability" is understood to "confer[ ] only a right not to pay damages, [whereas] an immunity from suit confers a right not to bear the burdens of litigation." *Nero v.*

---

[8] Yet again, the majority gets things exactly backwards. "Canons of statutory interpretation are only employed if the language of the statute is ambiguous." *JVC Enters., LLC v. City of Concord*, 376 N.C. 782, 786 (2021) (cleaned up).  Otherwise, "[i]f the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." *State v. Beck*, 359 N.C. 611, 614 (2005).

*Mosby*, 890 F.3d 106, 121 (4th Cir. 2018). If, as the majority says, Congress were so myopically focused on insulating providers only from "the measurable and compensable" damages afforded in tort, why would it have gone to the trouble of granting the greater protection—divorced from damages concerns—of immunity from suit?

As for the majority's assertion that any other reading of the PREP Act defies common sense, that argument fails because the PREP Act neither promotes wrongdoing nor does it completely insulate bad actors from punishment. Immunizing covered persons from civil suits does not positively reward—and thus incentivize— any particular misconduct. Moreover, PREP Act immunity is one from *civil* suits and liability. A person who violates a penal statute may still be charged and punished criminally because a prosecution is not in any sense a "claim for loss," and our statutes already criminalize the unlawful administration and dispensation of medication, including to children. *See, e.g.,* N.C.G.S. § 110-102.1A (2023) (criminalizing administration of medication without parental consent to children attending childcare facilities); N.C.G.S. § 90-85.40 (2023) (criminalizing violations of the North Carolina Pharmacy Practice Act). Licensing discipline is likewise not preempted by the PREP Act. *See Leonard*, 61 F.4th 914–15 (noting that the argument the PREP Act precludes licensing discipline "stretches the text too far. The more natural reading of the statute is that covered persons are immunized from suits by plaintiffs trying to recover for the *plaintiffs*' losses caused by covered persons, not

suits by those seeking to impose a loss *on* the covered person."). Congress clearly weighed its need to encourage a fulsome response to nationwide medical emergencies against the possibility of wrongdoing, and it thus did *not* immunize covered persons from the comparatively *greater* punishments of deprivations of liberty and livelihood.

At least one other question goes unanswered by the majority's approach. Tort law and the state constitution undoubtedly serve different, if occasionally related, aims, at least insofar as tort law protects people from each other and the state constitution protects the people from the excesses of government. But there is an alignment—rather than a division—between the state and federal constitutions in this regard. *See, e.g., McDonald v. City of Chicago,* 561 U.S. 742, 818 (2010) (Thomas, J., concurring in part and concurring in the judgment) (recognizing the Bill of Rights is incorporated into the Constitution "to expressly protect . . . fundamental rights against interference by the Federal Government"). And yet, "Congress intended to expressly immunize covered persons from § 1983 actions for claims covered by the [PREP] Act, *even if those claims are federal constitutional claims.*" *Maney v. Brown*, 91 F.4th 1296, 1303 (9th Cir. 2024) (emphasis added).[9] If Congress was truly looking

---

[9] This clear and unequivocal statement in *Maney* followed those that the majority reads as rendering "its reasoning and conclusion in-less-than definite terms," due to "its language . . . bec[oming] progressively less forceful." Perhaps the majority is reading *Maney* backwards, too.

In any event, the majority's attempt to distinguish *Maney* on the basis of § 1983 is just as unpersuasive as its effort to assert that *Leonard* is analogous to this case. Section 1983 is nothing more than "a mechanism for vindicating federal statutory or constitutional rights." *Maney*, 91 F.4th at 1302 (cleaned up). While this Court has noted that *Corum* "is

only to immunize parties in cases involving interpersonal tort harms, why would it also extend that immunity to federal constitutional claims that seek to vindicate private rights against government overreach? *See, e.g., Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("The first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed."). Likewise, and even more pressingly, why would it extend that immunity to federal constitutional claims and *not* state ones involving exactly the same concerns? And how is a tort claim against government actors—persons explicitly immunized under the PREP Act, 42 U.S.C. § 247d-6d(i)(2)—any less of a "protect[ion] [of] the people from their government?" *See* majority *supra* Section II.B.2.b; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) ("In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees."); *Lombardo v. City of St. Louis*, 143 S. Ct. 2419, 2421 (2023) (Sotomayor, J., dissenting) (recognizing that "constitutional torts . . . deter and remedy official misconduct"). The majority's logic offers no answers and fails because of that silence.

The majority's ultimate answer is also not internally consistent on its own terms for another reason. The majority would selectively read the PREP Act to demonstrate a congressional intent to protect covered persons from the "measurable

---

not a state law equivalent" of § 1983 because of its more limited availability, remedial character, and state law origins, *Washington v. Cline*, 385 N.C. 824, 831 (2024), that does not change the fact that it, like § 1983, supplies the vehicle for the vindication of some underlying constitutional right.

and compensable" monetary damages available in tort.[10]   But *Corum* claims *also afford monetary relief*—as this Court has recently explained, "*Corum* claims are constitutional claims *for damages* directly against the State.   These claims are extraordinary and defy many principles of this Court's jurisprudence, *not least the principle that money damages against the State are barred unless the State has authorized them.*"  *Washington*, 385 N.C. at 825 (emphases added).   Given the other logical defects identified herein, there is no apparent reason why Congress would use the all-encompassing word "any" in the limited way the majority supposes.  Thus, the

---

[10] The majority relies in part on *Dressen v. AstraZeneca AB*, No. 2:24-CV-00337-RJS-CMR, 2024 WL 4666577 (D. Utah Nov. 4, 2024), describing its holding as "denying vaccine manufacturer's motion to dismiss [a] breach of contract case because the PREP Act's text was limited to 'tort-like claims.'"  That description, however, is not quite accurate, and a proper understanding of the case materially undermines the majority's position.  The core holding in that case was that "PREP Act immunity requires a causal link between the claim and a tangible medical countermeasure, and breach of contract claims arise from one party's failure to perform a legal obligation without regard to any countermeasure."  *Dressen*, 2024 WL 4666577, at *3.  In other words, that court appropriately read the causality requirement as the principal restriction on the applicability of the PREP Act's wide grant of immunity, which is a fundamentally different approach from the category-based limitation adopted by the majority here.  And while the *Dressen* court did opine that the illustrative examples of loss in the PREP Act "*suggests*" that only tort-based claims were immunized, *id.* at *10 (emphasis added), that is a far less robust statement than that described by the majority.  Finally, *Dressen* adopted an interpretation that actually *furthered* the purposes of the PREP Act:

> requiring covered entities to adhere to their contracts will ensure maximal cooperation between covered entities and consumers during the most critical stages of pandemic response. The speed and agility with which covered entities can operate during public health emergencies due to their widespread tort immunity would be undermined if the *express* promises they make along the way were not enforceable.

*Id.* at *11.  The majority's holding today does the opposite—it actively frustrates the express purposes of the PREP Act, and it directly undermines the immunity from liability and suit by allowing parties to recast immunized tort claims as unimmunized constitutional ones.

majority's reading leaves us with the following entirely tortured and illogical result: immunity from "*any* claim for loss" really means immunity from (a) tort claims for damages caused by government actors who overstep their lawful authority, but not (b) state constitutional claims for damages against government actors who overstep their lawful authority. One wonders how "any" could both mean so much and so little, and why Congress would have intended such a result in light of the manifest purposes of the PREP Act.

In sum, whatever the majority is doing, it cannot in any sense be said to be textualist, let alone vindicative of Congress's will. It employs interpretative canons to create an ambiguity rather than to clarify one. It reads the statutory language right-to-left, not left-to-right. It adopts a reading that frustrates, instead of fosters, the patent aims of the PREP Act. It eschews an obvious and plain meaning in favor of an entirely presumed and internally inconsistent one. And, though it is too timorous to include the appropriate quotation marks, the majority flagrantly rewrites "'all claims for loss' as "all claims for *tort* loss."

I see no need to engage in any of these many "somersaults," *Riegel*, 552 U.S. at 325, and would do what the plain text of an unambiguous statute—in furtherance of the clear intentions of the entire PREP Act—commands: hold that "all claims for loss" actually means "*all* claims for loss," 42 U.S.C. § 247d-6d(a)(1), and " 'loss' " actually "means *any* type of loss," *id.* § 247d-6d(a)(2)(A). Adherence to that plain text, consistent with and not in opposition to the congressional intent and the overarching

structure of the PREP Act, is what respect for the legislative branch and constitutional preemptive powers of Congress demands. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("First, the purpose of Congress is the ultimate touchstone in every pre-emption case." (cleaned up)); *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 62–63 (2002) ("[O]ur task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." (cleaned up)); *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 144 S. Ct. 457, 472 (2024) ("When Congress takes the trouble to define the terms it uses, a court must respect its definitions as virtually conclusive." (cleaned up)). The majority's mere lip service to these principles does not suffice, either to effectuate our constitutional duties to faithfully interpret the law or to show appropriate respect to the powers of the other branches and the federal government.

## II. The *Corum* Claims

As explained above, I would hold any constitutional claims raised by plaintiffs to be preempted by the PREP Act, rendering the defendants immune from suit. Thus, I would not reach the question of the scope and degree of any state constitutional rights at issue in this case. Nonetheless, because the majority does so—and in a way with which I disagree in form—I likewise dissent from this portion of the majority.

I take no umbrage with the concept of implied constitutional rights. *See, e.g., Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the

Constitution itself, by reason of guarantees implicit in the word 'liberty . . . .' "); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (recounting a number of rights impliedly secured by the Constitution, including rights to contract, marry, learn, pursue gainful employment, freely worship, start a family, "and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness"); *Standley v. Town of Woodfin*, 362 N.C. 328, 331 (2008) (observing that rights to interstate and intrastate travel are fundamental rights impliedly protected by the state and federal constitutions). The majority is undoubtedly correct that persons have a constitutional right to be free from forced medical procedures, and that parents have constitutional rights to the care, custody, and control of their children. I write separately, however, to offer a different articulation of our rights under the North Carolina Constitution.

I cannot agree with the majority that the right to bodily integrity does not impliedly or necessarily recognize a right to bodily autonomy, and there is no principled reason to carve the latter out, at least under the rubric adopted by the majority. *See Meyer*, 262 U.S. at 399 (siting the right to "freedom from bodily restraint" alongside several of the implied rights identified by the majority). The right to bodily autonomy—like the right to bodily integrity described by the majority—has roots in tort law, constitutional law, and foundational principles dating back to and predating the Founding. The writ of habeas corpus, "the great Writ of Right," *In re Bryan*, 60 N.C. (Win.) 1, 45 (1863), has long permitted persons the right

to "allege[ ] to be wrongfully imprisoned or restrained of his liberty," *id.*, pursuant to a procedure with an "origin long prior to Magna Charta," *In re Holley*, 154 N.C. 163, 168 (1910). And, as with bodily integrity and battery, persons wrongfully deprived of their physical liberty and bodily autonomy by private persons could sue in tort. *See, e.g., Evans v. Kennedy*, 2 N.C. (1 Hayw.) 422 (1796) (recognizing an enslaved person may sue for freedom by way of trespass and false imprisonment claims). Principles of bodily autonomy likewise have a ready analogue in the constitutional criminal law context: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. In short, the historical primacy of the right to control one's body cannot be in doubt. *See Union Pac. R. Co. v. Botsford*, 141 U.S. 250 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others."). I am troubled by the majority's recognition of a right to bodily integrity but not bodily autonomy under these same circumstances, both because it lacks any articulable principle and because I worry that it will lead to a highly arbitrary and politicized recognition of our individual liberties.

But these examples also draw into stark contrast the complications of tying each and every substantive due process right to a direct historical analogue. None of these principles were so "objectively, deeply rooted in this Nation's [or State's] history and tradition and implicit in the concept of ordered liberty," *Standley*, 362 N.C. at

331 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)), as to apply equally to persons of color, fully to women, or uniformly to the poor. *See State v. Tirado*, No. 267PA21, slip op. at 78–80 (N.C. Jan. 31, 2025) (Earls, J., concurring) (discussing in detail "the dangers of using history as the yardstick for modern constitutional rights," including that many rights did not historically extend with equal force to women, unlanded and poor persons, and non-white individuals). A Black person held in bondage could sue in tort for freedom, but slave status was a valid defense. *Evans*, 2 N.C. (1 Hayw.) at 422–23. Various evidentiary assumptions attached if such a case went to trial; for example, if the plaintiff's mother was "of a black African complexion," and not "a yellow complexion," then the jury was required to presume she was a slave and that her offspring were as well, as "a presumption of slavery *must* arise from a black [skin tone]." *Scott v. Williams*, 12 N.C. (1 Dev.) 376, 377 (1828).[11] And slaves certainly were denied any sense of bodily autonomy, let

---

[11] The history of parental rights is no less fraught; slaves also lacked any constitutional right to the care, custody, or control of their children. *See Jones v. Jones*, 1 N.C. (Cam. & Nor.) 482, 483 (1801) (holding a will devising a female slave to one of the deceased's heirs did not result in the devise of the slave's children to that preferred heir; instead, the children passed by remainder to a different heir). If the majority is to truly recognize the robust constitutional rights of parents, its practice in other areas of family law should show a departure from, rather than reinforcement of, any historically disparate treatment of disadvantaged populations when it comes to exercising a constitutional right to parent. *See In re L.L.*, 386 N.C. 706, 725 (2024) (Riggs, J., concurring in part and dissenting in part) ("[T]he majority opens the door for classist biases and assumptions to pour into trial courts' considerations of [child] placement and best interest."); *In re G.B.*, 377 N.C. 106, 128 (2021) (Earls, J., dissenting) ("Respondent-father should not, in North Carolina, have his parental rights terminated merely because of his incarceration."); *N.C. Farm Bureau Mut. Ins. Co. v. Martin*, 376 N.C. 280, 298–99 (2020) (Earls, J., dissenting) (critiquing an interpretation of an insurance contract that "fail[ed] to account for and give legal recognition

alone integrity. *See, e.g., State v. Mann*, 13 N.C. (2 Dev.) 263, 266 (1829) ("Such obedience is the consequence only of uncontrolled authority over the body. There is nothing else which can operate to produce the effect. The power of the master must be absolute, to render the submission of the slave perfect.").

Bodily integrity was likewise not fully extended to women. If a married woman was the victim of a battery, she could only sue in conjunction with her husband. *Crump v. McKay*, 53 N.C. (8 Jones) 32, 33 (1860). If she was beaten by her husband, she could not testify against him to demonstrate a battery unless he "inflicted or threatened a lasting injury or great bodily harm," *State v. Hussey*, 44 N.C. (Busb.) 123, 127 (1852); indeed, a husband could not be convicted of battery unless he acted with malice or caused permanent injury, because he was perceived as "responsible for the acts of his wife, and he is required to govern his household, and for that purpose the law permits him to use towards his wife such a degree of force as is necessary to control an unruly temper and make her behave herself." *State v. Black*, 60 N.C. (Win.) 262, 263 (1864). In such cases, the abused spouse was not to seek redress at law, but to return to the home, "make the matter up and live together as man and wife should," *id.*, "necessary" beatings and all.

---

to the residential patterns that so many families experience in rural areas"); *see generally* Janet L. Wallace & Lisa R. Pruitt, *Judging Parents, Judging Place: Poverty, Rurality, and Termination of Parental Rights*, 77 Mo. L. Rev. 95 (2012) (discussing the disparate impact of termination of parental right considerations on rural and impoverished families); Robyn M. Powell, *Legal Ableism: A Systematic Review of State Termination of Parental Rights Laws*, 101 Wash. U. L. Rev. 423 (2023) (discussing the same regarding parents with disabilities).

In short, requiring that implied state constitutional rights be exclusively limited to direct historical analogues simply writes certain persons and rights out of constitutional protection—not because of any "objective[ ]" principle relating to "concept[s] of ordered liberty," *Standley*, 362 N.C. at 332 (cleaned up), but because of direct, purposeful, and invidious discrimination in our history that stands contrary to any sense of "ordered liberty" recognized today.  These analogues were exclusionary not only in their formulation and articulation, but also in their application, revealing a history—even a recent history—that is inherently contrary to our present sense of liberty and implied constitutionally protected rights, including those recognized by the majority here.  Though the majority acknowledges an implied constitutional right to bodily integrity that includes a right to be free from forced medical procedures, less than fifty years ago, this Court upheld as constitutional the forcible sterilization of the intellectually disabled, *In re Moore*, 289 N.C. 95 (1976), relying in part on an early 20th century Supreme Court decision stating, "[i]t is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. . . . Three generations of imbeciles are enough." *Buck v. Bell*, 274 U.S. 200, 207 (1927).  History may certainly be helpful in defining and understanding the rights protected by our foundational documents, but we must acknowledge the full history of these rights, and in doing so understand why it cannot

be the sole and exclusive source for our "objective[ ]" understanding of "concept[s] of ordered liberty." *Standley*, 362 N.C. at 332 (cleaned up).

Finally, as to the majority's decision to recognize a discrete constitutional right of parents to make medical decisions for their children, I believe such a holding entirely unnecessary. As even the majority acknowledges, our caselaw establishing and detailing the constitutional rights of parents already encompasses the fundamental concerns undergirding the majority's articulation. But going so far as to describe it as a discrete right, with only a scant few sentences acknowledging its limits in only the most general of senses, needlessly presents a host of complicating constitutional concerns, both direct and indirect. Consider, for example, N.C.G.S. § 90-21.1 (2023). First enacted in 1965, that statute authorizes lifesaving medical treatment for minors without parental consent when the time necessary to obtain parental consent—or to litigate a refusal of parental consent in court—would place the minor's life in jeopardy.[12] *Id.* Or, more indirectly, consider our precedent that "the state has a compelling interest in seeing that children are educated and may, constitutionally, establish minimum educational requirements and standards for this

---

[12] One could foresee this situation arising under the PREP Act where a vaccine authorized by an emergency use declaration is the only lifesaving treatment available. *But see* N.C.G.S. § 90-21.5(a1) ("Notwithstanding any other provision of law to the contrary, a health care provider shall obtain written consent from a parent or legal guardian prior to administering any vaccine that has been granted emergency use authorization . . . to an individual under 18 years of age."); *see* majority *supra* Section II.B.3. (asserting, in entirely conclusory fashion, that N.C.G.S. § 90-21.5(a1) does not meaningfully impede Congress's interests in passing the PREP Act).

education." *Delconte v. State*, 313 N.C. 384, 401–02 (1985). Given the ill-defined contours of the discrete constitutional right identified today, the majority's strictly historical (and, as described herein, also ahistorical) approach to articulating parental rights, its broader statements tightly curtailing any state interest in the rearing of children, and the presumptions it asserts regarding the same, it seems only too certain that the survival of these longstanding directives of state law will be questioned. Maybe that is the intention, but this Court ought not be in the business of installing backdoors into loadbearing constitutional walls.

### III.  Conclusion

The facts alleged in the plaintiffs' complaint are undoubtedly troubling; as even the defendants' policies provided, the administration of a vaccine to a minor child without parental consent in these circumstances was wrong. The minor child and his parents had every right and reason to be outraged at their losses of their physical and parental rights. And, absent any congressional countermand, they should have the opportunity to pursue any lawful claims for those losses against those responsible.

But "tragic facts make bad law," *Wyeth*, 555 U.S. at 604 (Alito, J., dissenting), and "the Legislature's superior capacity for weighing competing interests means that we must be particularly careful not to substitute our judgment of what is desirable for that of Congress," *Holder v. Hum. Law Project*, 561 U.S. 1, 34 (2010). And in the case of the PREP Act, Congress balanced the need for maximum public and private

participation in rapid nationwide responses to public health crises against the right to recovery via civil suits like the one before this Court.

I am unable to concur in the majority for the reasons outlined *supra* Part II. In an attempt to obscure the clear and obvious congressional purposes in enacting the PREP Act, the majority first articulates two implied constitutional rights through flawed—and unnecessary—historical analyses. From there, it uses the heft of the principles articulated under that shaded history like a weighted blanket to cover up what it's really doing: reasoning backwards so that it can rewrite a statute to avoid a legislative policy preference it finds distasteful. The ultimate effect is to smother Congress's plain and obvious intent. But the PREP Act is clear: " 'loss' means *any* type of loss," 42 U.S.C. § 247d-6d(a)(2)(A) (emphasis added), and immunity from suit and liability "applies to *any* claim for loss that has a causal relationship" to the provision of a covered countermeasure, *id.* § 247d-6d(a)(2)(B) (emphasis added); *see also id.* § 247d-6d(a)(1) (providing immunity for "*all* claims for loss caused by, arising out of, relating to, or resulting from" the provision of a covered countermeasure (emphasis added)). That this plain and unambiguous language leads to what a judge might view as undesirable policy outcomes—or even unforeseen ones—is no reason to disregard congressional intent; to the contrary, it reinforces our duty to apply it consistent with its broad reach. *See, e.g., Haroco, Inc. v. Am. Nat. Bank and Tr. Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984) ("[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.

It demonstrates breadth.").  After all, as the majority sees no irony in preaching, we are "a government of the people, not of the judges." *Harper v. Hall*, 384 N.C. 292, 299 (2023).  I respectfully dissent.

Justice EARLS joins in this dissenting opinion.